# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 11, 2022

Lyle W. Cayce
Clerk

No. 20-30090

B. A. Kelly Land Company, L.L.C.,

*Plaintiff—Appellant*,

*versus*

Aethon Energy Operating, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:18-CV-1243

Before Higginbotham, Smith, and Dennis, *Circuit Judges*.
James L. Dennis, *Circuit Judge*:

Plaintiff B.A. Kelly Land Co., L.L.C. ("Kelly") is the owner of a 160-acre tract of land in Bossier Parish, Louisiana (the "tract") that is included within two compulsory oil and gas drilling and production units established by the Louisiana Commissioner of Conservation (collectively, the "Units"). Defendant Aethon Energy Operating, L.L.C. ("Aethon") is the designated operator of the two drilling units which include sixteen producing wells.

No. 20-30090

Kelly's tract is unleased, that is, it is not subject to a valid oil, gas or mineral lease to the operator, Aethon, or to anyone else.[1]

This controversy involves the interpretation of portions of the Louisiana Oil and Gas Conservation Act, La. R.S. 30:103.1 and 30:103.2, which read as follows:

> § 103.1 Operators and producers to report to owners of unleased oil and gas interests
>
> A. Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas, or mineral lease, said operator or producer shall issue the following reports to the owners of said interests by a sworn, detailed, itemized statement:
> (1) Within ninety calendar days from completion of the well, an initial report which shall contain the costs of drilling, completing, and equipping the unit well.
> (2) After establishment of production from the unit well, quarterly reports which shall contain the following:
> (a) The total amount of oil, gas, or other hydrocarbons produced from the lands during the previous quarter.
> (b) The price received from any purchaser of unit production.
> (c) Quarterly operating costs and expenses.
> (d) Any additional funds expended to enhance or restore the production of the unit well.
>
> B. No operator or producer shall be required under the provisions of this Section to report any information which is not known by such operator or producer at the time of a report.

---

[1] The minerals underlying the tract had been subject to a mineral servitude owned by Dorothy Richardson, who had leased the minerals, but upon her death on November 11, 2013 the servitude and lease expired and the mineral rights reverted to Kelly, the surface owner, at which point the mineral rights became unleased.

2

No. 20-30090

However, the operator or producer shall report the required information to the owner of the unleased interest within thirty days after such information is obtained by the operator or producer, or in the next quarterly report, whichever due date is later.

C. Reports shall be sent by certified mail to each owner of an unleased oil or gas interest who has requested such reports in writing, by certified mail addressed to the operator or producer. The written request shall contain the unleased interest owner's name and address. Initial reports shall be sent no later than ninety calendar days after the completion of the well. The operator or producer shall begin sending quarterly reports within ninety calendar days after receiving the written request, whichever is later, and shall continue sending quarterly reports until cessation of production.

D. Notwithstanding any other provision of this Section to the contrary, at the time a report is due pursuant to this Section, if the share of the total costs of drilling, completing, and equipping the unit well and all other unit costs allocable to an owner of an unleased interest is less than one thousand dollars, no report shall be required. However, during January of the next calendar year, the operator or producer shall report such costs to the owner.

103.2 Failure to report; penalty

Whenever the operator or producer permits ninety calendar days to elapse from completion of the well and thirty additional calendar days to elapse from date of receipt of written notice by certified mail from the owner or owners of unleased oil and gas interests calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of

No. 20-30090

the unleased oil and gas interests for the costs of the drilling operations of the well.

Kelly brought this diversity action on September 21, 2018 against Aethon in the Western District of Louisiana, principally for a judgment declaring that Aethon, as operator of the Units, had failed to comply with its disclosure and reporting obligations to Kelly, as an unleased owner, under Louisiana's conservation laws, and that, consequently, Aethon had forfeited its right to demand contribution from Kelly for a proportionate share of the costs of well drilling operations.[2] *See* La. R.S. 30:103.1, 103.2  Kelly moved for partial summary judgment on its principal forfeiture claim based on its two certified mail letters to Aethon: (1) a letter dated December 15, 2017  informing Aethon that it was an unleased owner of a tract of land within the Units and requesting certain information regarding the sixteen wells described by name and serial numbers within the Units; and (2) a letter dated April 17, 2018 calling to Aethon's attention Aethon's failure to provide the information requested in its December 15, 2017 letter.  The district court denied Kelly's motion for partial summary judgment and *sua sponte* issued summary judgment for Aethon.  Kelly appealed.[3]

---

[2] Kelly pleaded three claims in total.  First, a claim based on its direct correspondence with Aethon alleging that Aethon defaulted on its reporting obligations to report to Kelly under §§ 103.1 and 103.2 ("the direct forfeiture claim").  Second, a claim based on Aethon's alleged liability as successor to the former operator of the units, J-W Operating Company ("J-W"); Kelly alleged that J-W defaulted on its reporting obligations to Kelly and that Aethon, as J-W's successor, assumed J-W's liability for failure to comply ("the successor claim").  Third, Kelly asserted that Aethon owed it an accounting for both Units' production revenues and payment to Kelly of its share of those revenues related to the tract ("the accounting claim").  This appeal focuses mainly on Kelly's direct-correspondence-with-Aethon claim.

[3] Kelly moved for partial summary judgment exclusively with respect to its direct forfeiture claim.  Neither Kelly nor Aethon moved with respect to Kelly's alleged successor claim against Aethon.  The district court denied Kelly's motion on its direct forfeiture

No. 20-30090

We conclude that the district court, in finding fault with Kelly's direct forfeiture claim, erroneously engrafted conditions into §§ 103.1 and 103.2 that are not present in the text of the statutes themselves. Applying the text of the statutes, we conclude that (1) the district court erred in granting *sua sponte* partial summary judgment to Aethon and in dismissing both of Kelly's forfeiture claims with prejudice; (2) Kelly is entitled to summary judgment on its motion for partial summary judgment on its direct forfeiture claim against Aethon; and (3) the district court's dismissal of Kelly's successor forfeiture claim must be vacated and remanded for further proceedings because the record does not contain grounds warranting summary judgment on that claim. Additionally, we conclude that (4) we have pendent appellate jurisdiction to review the denial of Kelly's request for leave to amend to implead Aethon LP; but (5) we conclude that the district court did not abuse its discretion in denying Kelly leave to amend.

## I.

Louisiana's oil and gas conservation law provides that the Commissioner of Conservation, for the prevention of waste and to avoid the drilling of unnecessary wells, is vested with authority to establish a drilling unit for each pool of underground oil or gas. La. R.S. 30:9(B). Unitization enables the Commissioner to authorize an operator to establish an oil and gas

---

claim and, after giving notice and an opportunity for Kelly to respond, *sua sponte* rendered partial summary judgment in favor of Aethon and dismissed *both* of Kelly's forfeiture claims (the direct forfeiture claim *and* the successor claim), with prejudice, leaving only Kelly's claim for an accounting and payment of Unit production pending in the district court. The district court then certified its denial of Kelly's motion and its *sua sponte* grant of partial summary judgment to Aethon as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). The district court also denied Kelly's motion for leave to file a second amended complaint to add as a defendant Aethon's principal, Aethon United BR LP ("Aethon LP"), concluding that Aethon LP was not an indispensable party under Federal Rule of Civil Procedure 19.

drilling unit across multiple tracts of land, even if all owners of oil and gas interests in the drilling unit have not agreed to pool their interests. La. R.S. 30:10(A)(1); *see T D X Energy, L.L.C. v. Chesapeake Operating, Inc.*, 857 F.3d 253, 257 (5th Cir. 2017). The Commissioner "has the plenary authority to declare drilling and production units, to force pool neighboring tracts and leases into a single unit, to designate a single well and operator for the unit, and to allocate production from the unit well to each participating tract and lease—all for the purpose of conserving resources, avoiding waste, and eliminating unnecessary wells." *Peironnet v. Matador Res. Co.*, 144 So. 3d 791, 822 (La. 2013) (citing La. R.S. 30:4, 9, 10). The designated operator is then charged with drilling within the unit and paying a proportionate share of the proceeds of the production to the owners of mineral interests in the unit. *T D X Energy, L.L.C.*, 857 F.3d at 257 (citing La. R.S. 30:10(A)(1)(b)).

Consequently, the Louisiana Supreme Court has held that "the more recent legislative enactments of Title 30 [the Conservation Act] and Title 31 [the Mineral Code] supersede in part La. Civ. Code Ann. art. 490's general concept of ownership of the subsurface by the surface owner of land." *Nunez v. Wainoco Oil & Gas Co.*, 488 So. 2d 955, 964 (La. 1986). "Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently." *Id.* Yet, despite the "far-reaching restriction upon the old concepts of private property" brought about by, *inter alia*, statutes instituting unitization and forced pooling, "the need for an orderly development of the state's mineral program appears to justify the legislative action." Harriet Daggett, Mineral Rights in Louisiana 443 (revised ed. 1949).

"In both voluntary and compulsory unitization, well cost disputes arise. When there is an operating agreement [i.e. a contract or mineral lease] among the parties, such disputes are generally addressed in the agreement." 1 Bruce M. Kramer & Patrick H. Martin, The Law of Pooling and Unitization § 14.04 (3d ed. 2016). But, when a "forced pooling" regime "allows the government to authorize a single operator to drill for oil and gas even when all parties possessing oil and gas interests in the drilling area have not agreed to go forward," meaning that some interest owners do not have a contract or mineral lease with the operator, then the "statutory scheme thus has to address a number of issues that contracts usually decide, such as how to allocate costs and risk among those holding interests in the oil and gas," and how the operator should provide an accounting of well production and costs to owners of oil and gas interests. *T D X Energy, L.L.C.*, 857 F.3d at 256.

When the operator proposes to drill a well in a unit, it may give notice to owners of oil and gas interests within the unit, allowing owners to elect to participate in the risk by contributing to the drilling costs up front. *Id.* at 258 (citing La. R.S. 30:10(A)(2)(a)(i)). If an owner does not participate and the well produces, the operator may recover out of production the nonparticipating interest owner's share of expenditures and, in certain cases, a "risk charge" of two hundred percent of the owner's drilling expenditure share. *Id.* (citing La. R.S. 30:10(A)(2)(b)(i)). However, an owner of an "unleased interest not subject to an oil, gas, and mineral lease," like Kelly, is not subject to a risk charge. La. R.S. 30:10(A)(2)(e)(i).

Louisiana law also imposes a duty on operators to report information to unleased owners if requested. When a drilling unit authorized by the Commissioner includes land producing oil or gas upon which the operator or producer has no valid mineral lease, the operator shall issue reports to the unleased owners by sworn, detailed, itemized statements as prescribed by La.

R.S. 30:103.1(A).  Reports shall be sent by certified mail to each unleased owner who has requested such report in writing, by certified mail.  *Id.* § 103.1(C).  Additionally, § 103.2 provides that, if an operator fails to timely comply with § 103.1 and also fails to cure its default within thirty days of receiving notice of such failure from the unleased owner, then the operator cannot collect drilling costs from the owner.  *Id.* § 103.2; *see T D X Energy, L.L.C.*, 857 F.3d at 258.[4]   Section 103.2 adds teeth to § 103.1; it disincentivizes operators' failure to comply with § 103.1's reporting requirements.

Taken together, §§ 103.1 and 103.2 address an "information asymmetry" that arises from the "forced pooling" of mineral resources when there is no lease or contract between the operator and the owner of the oil and gas interest.  *T D X Energy, L.L.C.*, 857 F. 3d at 263.  Where, as here, unitization is governmentally instituted, "nonoperators," like Kelly, "lack access to the data showing the well production and costs" in the unit "in which they share."  *Id.* at 262-63.  Thus, §§ 103.1 and 103.2 help remedy the information asymmetry by creating an enforceable mechanism for nonoperators that have unleased interests in the minerals to obtain "an accounting of what the operator is doing."  *Id.* at 263; *see also Brannon Props., LLC v. Chesapeake Operating, Inc.*, 514 F. App'x 459, 461 (5th Cir. 2013) (explaining that § 103.1's "'detailed' requirement" means that "the report

---

[4] This court in *T D X Energy Erie*-guessed that an "owner of an unleased oil or gas interests" in the context of §§ 103.1 and 103.2 includes any owner of a mineral interest, as well as any lessee of such an interest, so long as that interest is not leased specifically to the designated operator.  857 F.3d at 259-63.  In other words, Louisiana law "requires that reports be given to owners of interests on which the operator has no lease."  *Id* at 262.  In this case, there is no dispute that Kelly is an "owner of an unleased oil or gas interest" within the meaning of §§ 103.1 and 103.2.  We are both bound and persuaded by our precedent in *T D X Energy, L.L.C. Id.* at 259-64.

No. 20-30090

has to relate the cost to the benefit: it must tell the unleased mineral owner what it is getting for its money.").

## II.

By October 1, 2016, Aethon was the operator of record for the Units that included Kelly's tract.[5]  On December 15, 2017, Kelly sent a letter by certified mail to Aethon stating that it was the owner of an unleased tract of land and mineral interests within the Units.  The letter also explained that, years earlier, on November 15, 2013, Kelly had sent a certified mail letter to a prior, unnamed operator of the Units requesting reports concerning the "costs and production" for the Units' wells but that the operator never responded.  Kelly's December 15, 2017 letter closed by requesting that Aethon provide categories of information pertaining to the operation of the Units.  Aethon did not send the requested information or otherwise respond in writing to the December 15, 2017 letter until either October 2018 or January 2019 (*see* n.9 *infra*).

On April 17, 2018, Kelly sent a second letter to Aethon by certified mail.  That letter referenced Kelly's request in its December 15, 2017 letter for "written reports concerning operating costs and expenses" for the Units and "call[ed] to [Aethon's] attention [the] company's failure . . . to comply with Louisiana law" by failing to provide the reports concerning the "ongoing operating costs and expenses for the Unit."  Aethon admits that it received both of Kelly's certified mail letters.  Aethon does not dispute that

---

[5] One unit is located in the Lower Cotton Valley Zone, Reservoir A, for the Elm Grove Field and referred to as "LCV RA SUH," while the other unit is located in the Haynesville Zone, Reservoir A, for the Elm Grove Field and is termed "HA RA SU 61." Aethon became the operator of record for LCV RA SUH on July 1, 2016, and the operator of record for HA RA SU 61 on October 1, 2016.  Kelly asserts, in an affidavit by member/owner Thomas Richardson, Jr., that Kelly has a 24.99071% *pro rata* share in the Units.

No. 20-30090

it did not send Kelly any of the reports Kelly requested within thirty days of receiving Kelly's April 17, 2018 certified mail letter.

On September 21, 2018, Kelly filed the instant diversity jurisdiction suit against Aethon in federal court. On August 2, 2019, Kelly moved for partial summary judgment only on its direct forfeiture claim, i.e., its claim based on Kelly's certified mail letters of December 15, 2017 and April 17, 2018 to Aethon. On October 8, 2019, the district court denied Kelly's motion. The district court's order also gave notice that the court intended to *sua sponte* enter partial summary judgment in favor of Aethon on Kelly's "forfeiture claims" and gave Kelly twenty-one days to file a response. On October 25, 2019, Kelly timely filed a motion for reconsideration and simultaneously filed a response to the district court's notice. On December 4, 2019, the district court denied Kelly's motion and *sua sponte* granted Aethon summary judgment on all of "Kelly's forfeiture claims . . . and dismiss[ed] those claims with prejudice."[6] Aethon then moved the district court to designate that order as an immediately appealable partial final judgment under Federal Rule of Civil Procedure Rule 54(b). The district court agreed. Kelly appealed.

## III.

On appeal, Kelly argues that the district court erred in (1) rejecting Kelly's motion for partial summary judgment to enforce Kelly's direct forfeiture claim against Aethon and (2) granting *sua sponte* summary judgment against Kelly dismissing with prejudice Kelly's two forfeiture claims against Aethon: the direct forfeiture claim and the successor claim. Both claims are governed by the plain terms of La. R.S. 103.1 and 103.2. Upon

---

[6] The district court noted that Kelly's "claim for a money judgment for unpaid unit revenues for the units in question after a full accounting of the sales of unit production remains pending."

No. 20-30090

applying §§ 103.1 and 103.2 to the present case, we find that the parties' correspondence shows that Kelly, in its December 15, 2017 letter, appropriately requested the Units' well data to which it was entitled as an unleased owner under § 103.1; that Aethon failed to report the data timely; that Kelly, in its April 17, 2018 letter, appropriately notified Aethon, pursuant to § 103.2, that it had defaulted on its § 103.1 reporting obligations; and that Aethon did not cure its default by complying with its duty under § 103.1 within thirty days of receiving notice of its default. Therefore, we conclude that, pursuant to § 103.2, Aethon forfeited its right as operator to recoup a *pro rata* share of the cost of drilling the Units' wells from Kelly.

In full, Kelly's initial December 15, 2017 letter to Aethon, sent by certified mail, read as follows:

> Dear Sirs:
>
> B.A. Kelly Land Co, LLC is an Unleased Owner of oil and gas interests in the W ½ of SE ¼, the NE ¼ of the SW ¼, and the SE ¼ of W ¼ of Section 11, Township 16, Range 11 W in Bossier Parish, Louisiana, situated in drilling units (LCV SUH) (HOSS RA SU 20) (HA RA SU 61) authorized by the LA Commissioner of Conservation, for which Aethon Energy acts as Operator.
>
> In a November 15, 2013 letter mailed to the operators for these wells, B.A. Kelly Land Co. notified those operators of its claim of an unleased interest in Section 11 which resulted following the death of Mrs. Dorothy Richardson on November 10, 2013. Additionally, that letter requested sworn, detailed, itemized statements of the costs and production for these wells and units. The November 15, 2013 letter did not result in a response by sworn statements of the HOSS RA SU20 and LCV SUH operators. Accordingly, the demands of B.A. Kelly Land [C]o. in this letter to you requests that the past cost and production for these unit wells be provided through November 10, 2013.

No. 20-30090

Please send the following information on each of the wells listed below:

l. The total amount of oil, gas or other hydrocarbons produced from the unit lands since November 10, 2013 for each well;
2. The price received on that product from any purchaser of unit production;
3. Operating costs and expenses since November 10, 2013 for each well;
4. Any additional funds expended to enhance or restore the production of the unit well(s) since November 10, 2013 for each well.

Respective Louisiana Department of Conservation serial numbers/names for these Aethon operated wells are:

| | |
|---|---|
| 226788 | Womack 11-1 |
| 227933 | Womack 11 2-Alt |
| 228694 | Tooke 11 1-Alt |
| 229062 | Roach et al 1 Alt |
| 230485 | E Roach 11 1-Alt |
| 232386 | Richardson 11 1-Alt |
| 231461 | Roach et al 11 2-Alt |
| 231538 | Roach et al 3-Alt |
| 233181 | G Horton 1-Alt |
| 233968 | E Roach 11 2-Alt |
| 234026 | Elm Grove Plantation 11 2-Alt |
| 234029 | Elm Grove Plantation 11 3-Alt |
| 234779 | Jetsma 11 1-Alt |
| 235441 | Richardson 11 2-Alt |
| 237499 | Richardson 11 3-Alt |
| 239632 | Womack 11-3 |

Please send the reports to B.A. Kelly Land Co, LLC c/o Alan L. Brittain, 400 Travis Street, Suite 30, Shreveport, LA 71101.

If you have any questions or comments, please do not hesitate to contact [the company].

12

Kelly contends that its December 15, 2017 certified mail letter to Aethon was a sufficient request under § 103.1, and that the district court erred in ruling to the contrary. We agree.

Kelly's December 15, 2017 letter to Aethon satisfied the express requirements of § 103.1: it was (1) in writing; (2) sent by certified mail addressed to Aethon; and (3) contained the name and address of Kelly, the unleased owner. Beyond complying with the statute's express requirements, the import of Kelly's letter was sufficiently clear to give Aethon, as operator of the Units, notice that Kelly, an unleased owner, was requesting reports pursuant to § 103.1. In its very first sentence, the letter expressly stated that Kelly was an "[u]nleased [o]wner of oil and gas interests," which is a person or entity to which § 103.1 provides a right to certain information upon request. Thus, Aethon immediately knew that Kelly's request could be from an unleased owner and therefore could not be dismissed out of hand or without careful consideration, and, in fact, Aethon was aware that it had no mineral lease on Kelly's land located within its two drilling units, as this was admitted by Aethon's senior landman in a declaration. The letter then correctly named the Units operated by Aethon and identified the location of Kelly's tract of land as lying in the W ½ of SE ¼, the NE ¼ of the SW ¼, and the SE ¼ of W ¼ of Section 11, Township 16, Range 11 W in Bossier Parish, Louisiana and within the Units at that location operated by Aethon. The letter also listed the names and serial numbers of the sixteen wells operated by Aethon in the Units. Thus, the letter was full of identifying information by which Aethon easily could verify from public land records that Kelly was an unleased owner of land within the two Units of which Aethon was the operator.

Further, the letter's request for four types of information concerning the Units matched almost verbatim the four categories of information that § 103.1 requires an operator's quarterly reports to an unleased owner to

contain. For example, the letter requested "[t]he total amount of oil, gas, or other hydrocarbons produced from the unit lands since November 10, 2013 for each well." This tracked almost word-for-word the statute's requirement that quarterly reports must include "[t]he total amount of oil, gas, or other hydrocarbons produced from the lands during the previous quarter." La. R.S. 30:103.1. Finally, the letter referenced an earlier request sent to the operator that preceded Aethon for "sworn, detailed, itemized statements"—a clear reference to the format required of reports under § 103.1.

In sum, Kelly's letter was replete with references to the substance and terms of § 103.1 such that any operator in the position of Aethon would have been put on notice that the letter was a request for reports from a person or entity that claimed to be an unleased owner pursuant to that statute. An operator has a statutory duty, prescribed by § 103.1, to send reports to unleased owners within the drilling unit upon request. *See Nunez*, 488 So. 2d at 963-64 (explaining that the establishment of a compulsory drilling unit by the Commissioner of Conservation creates and protects "'correlative rights' of nondrilling landowners," such that unitization itself "result[s] in changes in the legal relationships" between private parties within the unit).[7] As explained above, when an unleased owner's land is forcibly included in a compulsory drilling unit, that owner, who cannot prevent having its land unitized, must and can rely on the statutory scheme for protection of its rights in the absence of a lease or contract with the operator. *See* KRAMER &

---

[7] *See also Nunez*, 488 So. 2d at 964 ("Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently.").

MARTIN, *supra* at § 14.04; *see also T D X Energy, L.L.C.*, 857 F.3d at 256. We thus conclude that Kelly's December 15, 2017 letter was a sufficient request for reports under § 103.1 and therefore triggered Aethon's duty to send Kelly such reports.

It is undisputed that Aethon did not timely send quarterly reports upon receiving Kelly's request. Kelly then sent Aethon a second letter by certified mail on April 17, 2018. The letter read as follows:

> Dear Sirs,
>
> By certified mail dated December 15, 2017 and received by your company on December 20, 2017, B.A. Kelly Land Co., LLC identified itself as an unleased owner in the drilling unit affecting its land in Section 11, Township 16 North, Range 11 West, Bossier Parish, Louisiana and requested written reports concerning operating costs and expenses for each of the 16 unit wells listed therein. The interest now owned by B.A[.] Kelly became unleased on November 10, 2013, after the various times for payout of each unit well.
>
> This letter is to call to your attention your company's failure, as unit operator of the [2] units, to comply with Louisiana law which requires an operator to report to an unleased owner in a unit ongoing operating costs and expenses for the unit well by sworn, detailed, itemized statements.

Aethon received Kelly's second certified mail letter on April 20, 2018. Aethon also conceded, through its senior landman's declaration, under penalty of perjury, that it did not send any reports to Kelly "as required by La. R.S. 30:103.1" until February 12, 2019—long after the thirty-day period allotted to Aethon by § 103.2 for that purpose expired. Accordingly, we must decide whether the April 17, 2018 letter Kelly sent to Aethon via certified mail gave Aethon adequate notice under § 103.2 of its default on its statutory reporting duty, and thus whether the statute's forfeiture provision applies.

Applying the text of the statute, we conclude that Kelly's April 17, 2018 certified mail letter to Aethon called to its attention that Aethon had failed to comply with the provisions of § 103.1, which required it to report to Kelly, as an unleased owner, sworn, detailed, itemized statements of data pertaining to the Units and their 16 wells. First, the letter specifically noted that Kelly had sent to Aethon an earlier letter on December 15, 2017, by certified mail, requesting, as an unleased owner of land in the Units, "written reports concerning operating costs and expenses" for the Units. A reasonable operator, then, would have understood that this more recent letter followed up on the earlier letter concerning the operator's reporting obligations to the unleased owner under § 103.1. And the April 17, 2018 letter's mention of reports of "operating costs and expenses for . . . the unit wells" closely mirrored § 103.1's requirement that operators provide unleased owners with "[q]uarterly operating costs and expenses" for the unit wells. *Id.* § 103.1(A)(2)(c).

Furthermore, Kelly's April 17, 2018 certified mail letter to Aethon recited much of the crucial language of § 103.2, expressly "call[ing]" to Aethon's "attention [the] company's failure . . . to comply with Louisiana law." The letter then recited that state law "requires an operator to report to an unleased owner . . . ongoing operating costs and expenses for the unit well." This is the letter's second reference to the types of information that must be contained in the reports an owner of unleased mineral interests is owed under § 103.1. Last, the letter explicitly stated that the reports are to be made "by sworn, detailed, itemized statements"—another clear reference to § 103.1's requirements. On these facts, we conclude that Kelly's second letter fairly "call[ed] attention" to Aethon's "failure to comply with the provisions of R.S. 30:103.1." *Id.* § 103.2.

Upon receiving Kelly's notice of default, Aethon had thirty days to cure its default or else forfeit its right to demand contribution from Kelly for

the cost of drilling operations of the wells. It is undisputed that Aethon did not send reports within thirty days of its receipt of Kelly's second letter on April 20, 2018. Aethon contends that the April 17, 2018 letter was vague and asserts that its landman contacted a Kelly representative purportedly to discuss precisely what information Kelly sought. This argument misses the mark. That Aethon may have requested clarification or confirmation about the meaning of the April 17, 2018 letter does not mean that a reasonable operator would have failed to appreciate that the letter constituted notice under § 103.2 that it was in default on its reporting obligations under § 103.1. An operator like Aethon cannot shirk its duty without incurring the consequences the legislature has prescribed to protect the owners of unleased mineral interests. "Section 103.1 and its penalty provision, 103.2, are clear, precise and mandatory." *Rivers v. Sun Oil Co.*, 503 So. 2d 1036 (La. Ct. App.), *writ denied*, 505 So. 2d 58 (La. 1987); *see also* H. DAGGETT, *supra* at 422-23 (explaining that conservation statutes "provide new rules by which the game will be played"). After all, "[n]o one may avail himself of ignorance of the law." LA. CIV. CODE art. 5.

Moreover, Aethon's contention that its senior landman became confused about the meaning of Kelly's April 17, 2018 letter after his phone call to a Kelly representative rebounds to its disadvantage and does not afford it the defense it seeks. In his declaration under penalty of perjury, Aethon's senior landman does say at one point that the phone conversation gave him the impression Kelly was seeking information other than that owed to it under § 103.1. But the landman does not say what in particular could have given him that impression or inference, and a careful reading of the landman's declaration shows that he and Aethon, as reasonably competent mineral operators, must have known that Kelly was seeking the reports to which it was entitled under § 103.1. The landman's declaration corroborates that he and Aethon knew: (1) the history of how Kelly's tract in the drilling

No. 20-30090

units became unleased land upon the death of Dorothy K. Richardson on November 11, 2013; (2) that Kelly, as an unleased owner, was entitled to the Units' well cost data it had requested; and (3) that Aethon had received both Kelly's December 15, 2017 (request of well costs) certified mail letter and its April 17, 2018 (placing in default) certified mail letter. Aethon's senior landman's declaration also establishes that Aethon did not timely cure its default within thirty days of its April 20, 2018 receipt of Kelly's second letter pursuant to § 103.2.[8] Aethon many months later furnished Kelly with reports

---

[8] In part, the senior landman's declaration stated that:

(2) I am employed by Aethon Energy Operating LLC ("Aethon") as a Senior Landman, and I am fully competent to testify as to the matters stated in this Declaration based on my own knowledge, information, and belief.

. . .

(6) The minerals underlying the Tract were subject to a mineral servitude owned by Dorothy K. Richardson ("Richardson").

(7) Richardson had leased the minerals underlying the Tract, but, upon her death on November 11, 2013, the servitude and lease expired, and the minerals reverted to the surface owner B.A. Kelly, which was unleased.

. . .

(9) Via a letter dated December 15, 2017, B.A. Kelly informed Aethon that it was an unleased owner within the subject units and requested certain categories of information regarding the Wells, including information preceding the periods of Aethon's operatorship.

(10) On April 17, 2018, B.A. Kelly sent a second letter to Aethon, purporting to call to Aethon's attention Aethon's alleged failure to provide the information requested in B.A. Kelly's December 15, 2017 letter.

(11) On April 24, 2018, I contacted B.A. Kelly's representative, Alan L. Brittain ("Brittain"), by telephone to discuss exactly what information B.A. Kelly was seeking from Aethon.

. . .

(20) When Aethon received B.A. Kelly's April 17, 2019 [*sic*] letter, I was aware of Louisiana's Well Cost Reporting Statute [i.e. §§ 103.1 and 103.2].

it stated were "pursuant to the provisions of La. R.S. 30:103.1," but these reports did not cure Aethon's default because they were not sent until well after the thirty days provided by § 103.2 for that purpose had expired.[9]

In ruling against Kelly, the district court impermissibly imposed requirements on Kelly, the unleased owner, that are not present in the text of the statutes. For example, the district court stated that the December 15, 2017 letter did not comply with § 103.1 because it did not specifically cite "§ 103.1" by its number or specifically request that Aethon classify its reports as "initial reports" or "quarterly reports." Contrary to the district court's view, the text of § 103.1 does not require that an unleased owner's request for reports specifically cite statutes, either by title or section number, or expressly use the terms "initial reports" or "quarterly reports." Rather, a faithful reading of the statute demonstrates that its text primarily imposes a duty on *operators* to send reports when requested by unleased owners. *See id.* § 103.1(A). And, in order for an unleased owner to make a valid request for reports, § 103.1 only requires that the unleased owner "request[] such reports in writing, by certified mail addressed to the operator or producer" and that the request "contain the unleased interest owner's name and address." *Id.* § 103.1(C). Thus, to require an unleased owner to cite § 103.1 by title or statute number or to incant the words "initial report" or "quarterly report" to invoke its rights under § 103.1 would be to engraft conditions that

---

(21) Had B.A. Kelly referenced or cited to the Well Cost Reporting Statute in B.A. Kelly's written notices to Aethon, or had Brittain [Kelly's representative] requested those reports on the telephone during our conversation, then I would have provided the reports to B.A. Kelly as required by Section 103.1.

[9] Kelly asserts that Aethon first sent it reports on October 26, 2018. Aethon claims that it first sent Kelly a quarterly report on February 12, 2019, although the cover letter to the report is dated February 11. Regardless of whether Aethon first sent reports to Kelly in October 2018 or February 2019, either date was well over thirty days from Aethon's receipt of Kelly's second letter on April 20, 2018.

are not present in the text of the statute itself. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA. CIV. CODE art. 9. Therefore, as we explained above, Kelly's December 15, 2017 letter adequately complied with § 103.1's requirements.

Similarly, the district court erroneously concluded that Kelly's April 17, 2018 letter did not comply with § 103.2 because it did not contain an explicit citation to "§ 103.1" or "§ 103.2," or reference the possibility of "a lawsuit, penalty, or forfeiture under § 103.2." The district court erred in requiring that Kelly sacramentally and numerically set forth "§ 103.1" and "§ 103.2" in the second letter because nowhere does that provision insist that an unleased owner cite either the title or statute number of § 103.1 or § 103.2. Nor does § 103.2 demand the unleased owner provide notice to the operator of every possible consequence of failure to comply with its terms. What § 103.2 does require is that the owner of the unleased interest "call[] attention" to the operator's "failure to comply with the provisions of R.S. 30:103.1." La. R.S. 30:103.2. As we explained above, Kelly's April 17, 2018 letter adequately did so.

In sum, Kelly's December 15, 2017 letter was a sufficient request for reports by an unleased owner under § 103.1, and its April 17, 2018 letter was sufficient under § 103.2 to notify Aethon of its failure as operator of the Units to comply with its duty of reporting to an unleased owner when requested as prescribed by § 103.1. And it is undisputed that Aethon failed to provide Kelly with the reports required by § 103.1 within thirty days of receiving notice of its default, thus triggering the forfeiture provision of § 103.2. The district court therefore erred in denying summary judgment to Kelly on its direct forfeiture claim and further erred in *sua sponte* granting summary judgment in favor of Aethon on a record that supports summary judgment

for Kelly and not for Aethon.  Accordingly, we reverse and render judgment for Kelly on its direct forfeiture claim.

Neither party moved for judgment with respect to Kelly's successor claim in the district court, and, indeed, Kelly expressly declined to seek partial summary judgment on that claim.  However, the district court *sua sponte* dismissed this claim with prejudice along with the direct forfeiture claim.  The outcome of the successor claim is dependent on summary judgment evidence not in the record, i.e., Kelly's demands under §§ 103.1 and 103.2 directed to Aethon's predecessor operator, J-W, and evidence pertaining to Aethon's assumption of J-W's liability to Kelly.  Because the record does not support a grant of summary judgment to either Aethon or Kelly on that claim, we vacate the district court's order insofar as it dismissed the successor claim with prejudice and remand for further proceedings.

## IV.

On November 7, 2019, while its motion for reconsideration was pending, Kelly filed a motion for leave to file a second amended complaint to join Aethon's principal, Aethon LP, as an indispensable party under Federal Rule of Civil Procedure 19.  In its motion, Kelly disclosed that adding Aethon LP would defeat the court's diversity jurisdiction because Aethon LP is a citizen of California, as is Kelly.  The motion was referred to a magistrate judge who recommended denying it, finding, in part, that Kelly sought to add Aethon LP as a party for the purpose of destroying diversity jurisdiction, and that Kelly was dilatory in filing the motion because it waited more than thirteen months from the date of initiating suit to file the motion and more than three months after the deadline for filing amendments to pleadings and

joinder of parties.  The district court adopted the magistrate's recommended ruling.

On appeal, Kelly argues that it is entitled to amend its complaint because Aethon LP is an indispensable party under Rule 19 and that this court has pendent appellate jurisdiction over the district court's interlocutory order denying leave.  It acknowledges, however, that adding Aethon LP would destroy diversity and thus divest this court and the district court of jurisdiction.

First, although the order denying leave to amend was not included in the Rule 54(b) certification, we conclude that we have pendent appellate jurisdiction to review it.  Pendent appellate jurisdiction permits appeal of an otherwise unappealable order "'where review of [the] unappealable order is necessary to ensure meaningful review of the appealable order.'"  *Byrum v. Landreth*, 566 F.3d 442, 449-50 (5th Cir. 2009) (quoting *Thornton v. Gen. Motors Corp.,* 136 F.3d 450, 453 (5th Cir. 1998)).  Here, because there would no longer be complete diversity if Aethon LP were added as a party, we must review the district court's denial of leave to amend in order to ensure that the district court had subject-matter jurisdiction.[10]

We review the district court's denial of leave to amend for abuse of discretion.  *Robertson v. Intatrek Computer, Inc.*, 976 F.3d 575, 584 (5th Cir. 2020), *petition for cert filed* (March 01, 2021) (No. 20-1229).  Rule 15 says courts "should freely give leave [to amend] when justice so requires."  FED.

---

[10] *See Mastercard Int'l v. Visa Int'l Servs. Ass'n*, 471 F.3d 377 (2d Cir. 2006) (exercising pendent appellate jurisdiction to review denial of a motion to join an indispensable party under Rule 19 where joinder would destroy jurisdiction since review of the appealable order "would be meaningless if the district court was without jurisdiction over that claim in the first instance" because it should have granted the Rule 19 motion (quoting *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 269 (2d Cir. 1999)).

R. Civ. P. 15(a)(2).  Though this is a "generous standard," "'leave to amend can be properly denied when there is a valid justification,' such as undue delay, bad faith and dilatory motive."  *Robertson*, 976 F.3d at 584 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006)).  In this case, Kelly waited more than thirteen months after filing suit and eight months after it was aware of Aethon LP's existence to request leave to amend.  "Although Rule 15(a) does not impose a time limit 'for permissive amendment, at some point, time delay on the part of a plaintiff can be procedurally fatal.'  In such a situation, the plaintiff bears the burden of showing the delay to be 'due to oversight, inadvertence, or excusable neglect.'"  *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (internal citations omitted) (quoting *Whitaker v. City of Houston*, 963 F.2d 831, 836 (5th Cir. 1992)).  In its briefing to our court, Kelly does not address its delay in filing for leave to amend, and we discern no error in the district court's finding that Kelly acted in an unjustifiably dilatory manner in filing for leave to amend.

We also agree with the district court that Kelly cannot demand leave to amend under Rule 19, which requires joinder of necessary parties as long as their "joinder will not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a)(1). Aethon LP is not a necessary party, as its absence will not prevent the Court from "accord[ing] complete relief among [the] existing parties." Fed. R. Civ. P. 19(a)(1)(A). Kelly makes no showing that its ability to recover from Aethon would be impeded by the absence of Aethon LP as a party.  The district court did not abuse its discretion in denying leave to amend.

## V.

For these reasons, we REVERSE the district court's grant of partial summary judgment to Aethon on Kelly's direct forfeiture claim and instead

No. 20-30090

RENDER judgment for Kelly on that claim; VACATE the district court's partial summary judgment to the extent it dismissed with prejudice Kelly's successor claim and REMAND it for further proceedings; and, finding that we have pendent appellate jurisdiction over Kelly's appeal of the order denying leave to amend, AFFIRM the district court's denial of leave to Kelly to amend to add Aethon LP as a defendant. The case is REMANDED for further proceedings consistent with this opinion.