# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 24-313

**JAMES BERNARD MISTRETTA
AND GOSS FERRY ROAD
PROPERTIES, LLC**

**VERSUS**

**HILCORP ENERGY COMPANY**

\*\*\*\*\*\*\*\*\*\*

ON APPLICATION FOR SUPERVISORY WRIT FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2023-1178 "D"
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GARY J. ORTEGO
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Ledricka J. Thierry, Judges.

**WRIT GRANTED; RELIEF GRANTED; AND RENDERED.**

**Thomas Charles Stewart**
**Attorney at Law**
**1101 Hugh Walllis Rd. Ste. 105**
**Lafayette, LA 70508**
**(337) 231-0032**
**COUNSEL FOR PLAINTIFF/RESPONDENT:**
    **James Bernard Mistretta**
    **Goss Ferry Road Properties, LLC**

**Brian W. Capell**
**John M. Parker**
**Liskow & Lewis**
**P. O. Box 52008**
**Lafayette, LA 70505**
**(337) 232-7424**
**COUNSEL FOR DEFENDANT/APPLICANT:**
    **Hilcorp Energy Company**

**ORTEGO, Judge.**

Relator, Hilcorp Energy Company (Relator), seeks supervisory writs from the trial court's judgment granting Plaintiffs, James Bernard Mistretta and Goss Ferry Road Properties, LLC (Plaintiffs), partial summary judgment, and denying Relator's motion for summary judgment, as to Plaintiffs' penalty claims against Relator for its alleged failure to supply requested production and well costs information pertaining to an oil well. This court, in accordance with La.Code Civ.P. art. 966(H), granted the writ for the limited purpose of briefing and the opportunity for oral arguments. Thus, we now consider the merits.

### FACTS AND PROCEDURAL HISTORY

This case involves a dispute over a request for production and well costs information pertaining to an oil well which Relator operated within a "forced pooling" unit that was established by the Louisiana Commissioner of Conservation in accordance with the Louisiana Oil and Gas Conservation Act, La.R.S. 30:1, et seq. Plaintiffs own mineral interests in the drilling and production unit created by the Commissioner of Conservation, but their interests are not subject to a mineral lease. In their instant action for declaratory judgment and damages, Plaintiffs allege that Relator, as operator, failed to timely comply with their requests for information on drilling and well costs, pursuant to La.R.S. 30:103.1. Thus, Plaintiffs assert that they are entitled to enforce the penalty provision set forth in La.R.S. 30:103.2, which precludes the recovery of drilling costs as a result of noncompliance with La.R.S. 30:103.1.

Plaintiffs contend that Relator began drilling on June 24, 2022, and completed the well on September 3, 2022. Plaintiffs further contend that although they notified Relator of their unleased interests in the well, via a certified letter that was mailed on December 7, 2022, and received by Relator on December 12, 2022, Relator did not

respond until it sent Plaintiffs an email on February 16, 2023, which was 66 days after Relator's receipt of Plaintiffs' notice, and via a certified letter on February 20, 2023, which was 70 days after Relator's receipt of Plaintiffs' notice. Plaintiffs then filed a motion for partial summary judgment, seeking a finding that the penalty provision of La.R.S. 30:103.2 is applicable to the instant case.

In response, Relator filed a cross motion for summary judgment, arguing that Plaintiffs' case should be dismissed because the provisions of La.R.S. 30:103.1 should be read in conjunction with the provisions of La.R.S. 30:103.2. Thus, they argue the penalty provision in La.R.S. 30:103.2 was not triggered, due to Plaintiffs' failure to comply with the second notice requirement mandated La.R.S. 30:103.2.

Following a hearing, the trial court granted Plaintiffs' motion for partial summary judgment and denied Relator's cross-motion for summary judgment. Relator filed this application for a supervisory writ to review the trial court's ruling.

La.Code Civ.P. art. 966(H) provides, in pertinent part, that "[o]n review, an appellate court shall not reverse a trial court's denial of a motion for summary judgment and grant a summary judgment dismissing a case or a party without assigning the case for briefing and permitting the parties an opportunity to request oral argument." Accordingly, this case was assigned for the limited purpose of briefing and the opportunity for oral arguments was provided.

**SUPERVISORY RELIEF**

Jurisprudence has held that "the denial [of] a motion for summary judgment or partial summary judgment is an interlocutory judgment reviewable only on an application for a supervisory review from an appellate court." *Smith v. Tsatsoulis*, 14-742, pp. 1-2 (La.App. 4 Cir. 9/3/14), 161 So.3d 783, 784, *writ denied*, 14-2018 (La. 10/9/14), 150 So.3d 889 (citations omitted).

Also, "[t]he proper procedural vehicle to contest an interlocutory judgment that does not cause irreparable harm is an application for supervisory writs. *See* La. C.C.P. arts. 2087 and 2201." *Brown v. Sanders*, 06-1171, p. 2 (La.App. 1 Cir. 3/23/07), 960 So.2d 931, 933.

**ON THE MERITS**

Relator asserts that the trial court's ruling which grants Plaintiffs' motion for partial summary judgment and denies Relator's cross motion for summary judgment is erroneous because the ruling is contrary to the plain wording of the statues at issue as well as the jurisprudence interpreting those statutes.

Louisiana Revised Statutes 30:103.1, as amended by 2024 La. Acts 126 (to include brine extraction), provides as follows (*emphasis added*):

> A. Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil, gas, brine, or any combination thereof, upon which the operator or producer has no valid oil, gas, or mineral lease, the operator or producer shall issue the following reports to the owners of the interests by a sworn, detailed, itemized statement:
>
> (1) Within ninety calendar days from completion of the well, an initial report which shall contain the costs of drilling, completing, and equipping the unit well.
>
> (2) After establishment of production from the unit well, quarterly reports which shall contain the following:
>
> (a) The total amount of oil, gas, brine, or other hydrocarbons produced from the lands during the previous quarter.
>
> (b) The price received from any purchaser of unit production.
>
> (c) Quarterly operating costs and expenses.
>
> (d) Any additional funds expended to enhance or restore the production of the unit well.
>
> B. No operator or producer shall be required under the provisions of this Section to report any information which is not known by such operator or producer at the time of a report. However, the operator or producer shall report the required information to the owner of the unleased interest within thirty days after such information is obtained

by the operator or producer, or in the next quarterly report, whichever due date is later.

C. Reports shall be sent by certified mail to each owner of an unleased oil, gas, or brine interest who has requested such reports in writing, by certified mail addressed to the operator or producer. The written request shall contain the unleased interest owner's name and address. Initial reports shall be sent no later than ninety calendar days after the completion of the well. **The operator or producer shall begin sending quarterly reports within ninety calendar days after receiving the written request, whichever is later, and shall continue sending quarterly reports until cessation of production.**

D. Notwithstanding any other provision of this Section to the contrary, at the time a report is due pursuant to this Section, if the share of the total costs of drilling, completing, and equipping the unit well and all other unit costs allocable to an owner of an unleased interest is less than one thousand dollars, no report shall be required. However, during January of the next calendar year, the operator or producer shall report such costs to the owner.

Louisiana Revised Statutes 30:103.2, as amended by 2024 La. Acts 126, provides as follows (*emphasis added*):

> **Whenever the operator or producer permits ninety calendar days to elapse from completion of the well and thirty additional calendar days to elapse from date of receipt of written notice by certified mail from the owner or owners of unleased oil, gas, or brine interests** calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of the unleased oil, gas, or brine interests for the costs of the drilling operations of the well.

We note that in examining some of the history, purpose, and workings of

La.R.S. 30:103.1 and La.R.S. 30:103.2, jurisprudence has discussed these provisions

as follows:

> Louisiana's "forced pooling" regime is the subject of this case. It allows the government to authorize a single operator to drill for oil and gas even when all parties possessing oil and gas interests in the drilling area have not agreed to go forward. The Louisiana statutory scheme thus has to address a number of issues that contracts usually decide, such as how to allocate costs and risk among those holding interests in the oil and gas. We are presented with questions of statutory interpretation about this scheme's disclosure and risk-fee provisions.

4

Although Spindletop is an extreme example, similar wasteful overproduction was once common. A cause was the "rule of capture," the common law doctrine initially used in hunting disputes to determine ownership of wild animals unconstrained by property borders. Taught during the first days of law school, the doctrine says if you catch it first, it is yours. Courts later applied the doctrine to oil and natural gas, reasoning that they too cross property borders as they seep and spill through crevices underground. In that context, the rule means a landowner has a property right in oil and gas produced from wells on the owner's land, whether or not it migrated from other lands. ("If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.") So, under the common law, one landowner could drain an entire reservoir through wells on the landowner's property, even if the reservoir extended under others' lands. Naturally, surrounding owners usually would not sit idly by while valuable resources drained out from under them; instead, they raced to produce all the oil and gas they could through their own property, often drilling multiple wells to extract resources as quickly as possible. At Spindletop and elsewhere, this drove up production costs, reduced oil and gas market prices, and unnecessarily decimated the environment.

States intervened, creating often complex regimes to regulate drilling. First, they created spacing laws, which prevent wells from being drilled too close together. Then, to protect landowners who, as a result of spacing laws, were no longer able to drill on smaller tracts of land, they created pooling laws, which allow owners of adjacent tracts to combine their interests to form drilling units that meet spacing requirements. Many states also have "forced pooling laws," which force unwilling owners to be part of a drilling unit in order to protect their neighbors' rights to benefit from their mineral rights and to promote states' interests in preventing waste and promoting economic activity.

Louisiana is one such state. Its Commissioner of Conservation designates drilling units whenever necessary to prevent waste or avoid needless drilling, even if owners of oil and gas interests have not agreed to pool their interests. Once a unit has been established, the Commissioner may appoint an operator to extract oil and gas from a reservoir. The operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any acreage on which the operator does not have an oil and gas lease. If those other owners have leased their mineral interests to another party, operators often pay the lessee in kind and the lessee markets and sells the oil or gas, then pays its lessor royalties; if not, the operator often sells production and makes a cash payment to the owner.

As a corollary to this scheme for sharing the benefits of unit production in the absence of a contract, Louisiana law contains mechanisms for sharing drilling risks and costs. Each oil and gas interest owner is responsible for a share of development and operation

costs. To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs. The operator gives notice to oil and gas interest owners regarding the drilling of a well, allowing owners to elect to participate in the risk by contributing to drilling costs up front. If an owner does not participate, and the well produces, the operator can recover out of production the nonparticipating owner's share of expenditures along with a risk charge of two hundred percent of the owner's expenditure share.

The law requires operators to share information about the costs and production other owners share under the scheme. Section 103.1 of Title 30 creates an obligation for operators to issue upon request reports containing sworn statements about drilling and operating costs, amount of production, and the price received for any sale of production. Section 103.2 provides that when an operator does not provide this information within 90 days of completing a well and thirty additional days of receiving notice of its failure to comply with Section 103.1, it cannot collect drilling costs.

*T D X Energy, L.L.C. v. Chesapeake Operating, Inc.,* 857 F.3d 253, 256–58 (5th Cir. 2017) (citations and footnotes omitted).

Relator contends that Plaintiffs' case should be dismissed because the provisions of La.R.S. 30:103.1 should be read in conjunction with the provisions of La.R.S. 30:103.2, thus the penalty provision in La.R.S. 30:103.2 was not triggered, due to Plaintiffs' failure to comply with a second notice requirement mandated by La.R.S. 30:103.2.

Relator also disagrees with Plaintiffs' position that only a single notice must be sent to the well producer under La.R.S. 30:103.1 and La.R.S. 30:103.2. Relator also maintains that Plaintiffs are incorrect in their assertion that the 90-day period in La.R.S. 30:103.1 starts to run without the owners making an initial request to the well operator for drilling and production information. Relator argues that La.R.S. 30:103.1 and La.R.S. 30:103.2, when read together, provide for a dual notice requirement which consists of an initial notice request seeking the drilling and production information from the well operator, as well as a subsequent additional

6

notice to the well operator advising the operator that it had failed to provide the required information.

Additionally, Relator has cited persuasive jurisprudential authority which supports its position of a dual notice requirement, such as *B. A. Kelly Land Co., L.L.C. v. Aethon Energy Operating, L.L.C.*, 25 F.4th 369, 383 (5th Cir. 2022), wherein a well operator failed to report well data after it had received two letters from an unleased owner demanding a report. In that case, the court found that the first letter that the owner sent was sufficient to constitute a request for reports by an unleased owner under La.R.S. 30:103.1 and that the second letter was sufficient, under La.R.S. 30:103.2, to constitute notice to the well operator of its failure to comply with the reporting duty prescribed by La.R.S. 30:103.1.

Thus, Relator argues that the *B. A. Kelley* case and other cases referencing that case support Relator's assertion that La.R.S. 30:103.1 and La.R.S. 30:103.2 require the sending of an initial request to the operator under La.R.S. 30:103.1 (with a 90-day compliance deadline) and then sending a second request under La.R.S. 30:103.2 (with a 30-day compliance period).

Here, Relator contends that Plaintiffs in the instant case did not send a second notice to call Relator's attention as to Relator's failure to timely respond to Plaintiffs' initial request. Relator asserts that because Plaintiffs did not submit these two separate notices, the penalty provision in La.R.S. 30:103.2 does not arise. Therefore, Relator asserts that Plaintiffs' lawsuit, which seeks enforcement of the penalty provision, should be dismissed.

In opposition to the writ application, Plaintiffs contends that the trial court properly followed the express, unambiguous language in La.R.S. 30:103.1 and La.R.S. 30:103.2. Thus, Plaintiffs assert that the trial court correctly concluded that after 90 days had passed following the completion of the well and after 30 days had

7

passed after the well operator (Relator) received notice from unleased owners (Plaintiffs) requesting reports about drilling and operating costs as required by La.R.S. 30:103.1, then La.R.S. 30:103.2 took effect and provided for the forfeiture of the well operator's right to collect drilling costs from those owners of unleased oil and gas interests in the well. Plaintiffs note that the drilling of the well was completed on September 3, 2022, and that on December 2, 2022, Relator received the certified letter that Plaintiffs had sent providing notice of their request for information regarding production and drilling costs. Thus, Plaintiffs argue that the response that Relator sent to Plaintiff, via a certified letter dated February 20, 2023, was not timely under La.R.S. 30:103.2 because it was sent more than 30 days after Relator's receipt of Plaintiffs' notice. Plaintiffs maintain that because they do not have a lease contract with Relator and because they did not consent to the creation of the well unit by the Commissioner of Conservation, La.R.S. 30:103.1 and La.R.S. 30:103.2 provide the only means by which they, as unleased owners, can discover how much was spent on the well and how much oil and gas was produced. Further, Plaintiffs argue that it is illogical to conclude the legislature intended to permit a well operator to ignore a certified letter from unleased owners and then be free to ignore the unleased owners' letter if the operator does not receive a second letter after waiting 90 more days.

A review of the record shows that Plaintiffs fails to cite any case law in support of their position. Rather, they chose to simply rely on the wording of La.R.S. 30:103.2, standing alone, which establishes the forfeiture penalty, in support of their position that the only thing that is required for the penalty to apply is the passage of 90 days after completion of the well and the passage of an additional 30 days after receipt of the owners' request for drilling and production information. We find this

8

argument to be misguided and unsupported by law, jurisprudence, and the facts of this case.

Given the above, we find that the provisions of La.R.S. 30:103.1 should be read *in conjunction* with the provisions of La.R.S. 30:103.2, and when read together, the statutes provides that there must be two separate notices. As previously noted, La.R.S. 30:103.1(C) (*emphasis added*), in pertinent part, states, "[r]eports shall be sent by certified mail to each owner of an unleased oil, gas, or brine interest **who has requested such reports in writing**, by certified mail addressed to the operator or producer."

Thus, we find that the operator's obligation, under La.R.S. 30:103.1, to provide the owners of unleased interests with reports containing information about production and well costs *does not arise* until there has been a request made for such a report. While La.R.S. 30:103.1 requires a written request for the starting of the 90-day period for the operator to provide the report, La.R.S. 30:103.2 further provides for the passage of an additional 30 days after the owners of unleased interests have sent the well operator a notice "calling attention to failure to comply with the provisions of R.S. 30:103.1" before it takes effect and provides for the forfeiture of the well operator's right to collect drilling costs from those owners of unleased oil and gas interests in the well. We interpret La.R.S. 30:103.1 and La.R.S. 30:103.2, when read together, as requiring dual notices, specifically, both a notice of the owner's request for drilling and production information, as well as a second separate notice of the operator's failure to comply with the owner's initial request for the information to be provided by the operator, in this case Hilcorp.

Finally, we note that La.R.S. 30:103.2 is a penalty statute, and the jurisprudence has held that "penalty provisions are penal in nature and should be

9

strictly construed." *Albe v. Albe*, 97-1042, p. 5 (La.App. 4 Cir. 11/19/97), 703 So.2d 756, 759, *writ denied*, 97-3048 (La. 2/13/98), 709 So.2d 752 (citations omitted).

## DECREE

For the foregoing reasons, we find the trial court erred in granting Plaintiffs' motion for partial summary judgment and in denying Relator's motion for summary judgment. Accordingly, we reverse the judgment of the trial court, and render summary judgment in favor of Relator, Hilcorp Energy Company, dismissing Plaintiffs', James Bernard Mistretta and Goss Ferry Road Properties, LLC, penalty claims against Relator with prejudice.

**WRIT GRANTED; RELIEF GRANTED; AND RENDERED.**