# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 27, 2023

Lyle W. Cayce
Clerk

———————

No. 22-30302

———————

ALLEN JOHNSON; LINDA JOHNSON; DONALD A. CROSSLIN, JR.;
MARY JO GRAGG; RODNEY M. HUDSON; CLIFTON LAYMAN;
ALFRED R. MESHELL; SHERMAN R. MESHELL; DAVID E.
OLIVER; TRACY OLIVER; LAURA S. PENDLETON; ANDREW L.
PICCOLO; KARLA S. PICCOLO; RANDALL S. RODGERS; FREDDIE
P. SPOHRER; TIM G. TAYLOR; CHARLES R. WALDON; REXFORD
GALEN WHITE; JAMES SHOPE; DONNA SHOPE; CHARLOTTE
MCCUNE; JERRY MCCUNE,

*Plaintiffs—Appellants*,

*versus*

CHESAPEAKE LOUISIANA, L.P.; CHESAPEAKE OPERATING,
L.L.C.,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:16-CV-1543

———————————————————————

Before DENNIS, ELROD, and HO, *Circuit Judges*.

JENNIFER WALKER ELROD, *Circuit Judge*:

This case concerns the interplay between Louisiana's relatively new
conservation laws and its deeply rooted *negotiorum gestio* doctrine. Because

No. 22-30302

we cannot make a reliable *Erie* guess as to the applicability of Louisiana's *negotiorum gestio* doctrine, we CERTIFY a question to the Louisiana Supreme Court.[1]

I

Louisiana oil and gas law authorizes the state Commissioner of Conservation to combine separate tracts of land and appoint a unit operator to extract the minerals. La. Stat. Ann. § 30:9(B) (2022); *id.* § 30:10(A)(1) (2022). Where a tract is not subject to a lease, the unit operator can sell the landowner's share of production but must pay the landowner a pro rata share of the proceeds within one hundred eighty days of the sale. *Id.* § 30:10(A)(3) (2022).

Linda and James Johnson own unleased mineral interests in Louisiana that are part of a forced drilling unit. Chesapeake is the operator. The Johnsons allege on behalf of themselves and a named class that Chesapeake has been improperly deducting post-production costs from their *pro rata* share of production and that this practice is improper *per se*.[2] The district court initially granted Plaintiffs' cross-motion for partial summary judgment. Chesapeake then filed a Motion for Reconsideration. That motion for reconsideration was granted, holding that the quasi-contractual doctrine of *negotiorum gestio* provides a mechanism for Chesapeake to properly deduct post-production costs.[3]

_____

[1] We previously certified this same issue in *Self v. BPX Operating Co.*, 80 F.4th 632 (5th Cir. 2023). This opinion reflects the same reasoning as in *Self*. We certify this case, so that the parties might have the opportunity to present their case to the Louisiana Supreme Court.

[2] This case was consolidated for oral argument with *Self v. BPX*, No. 22-30243, because both cases raise the same statutory interpretation issue.

[3] Only the first count of this lawsuit, seeking monetary damages, declaratory

No. 22-30302

Plaintiffs filed this action as unleased mineral owners whose interests are situated within forced drilling units formed by the Louisiana Office of Conservation and operated by Chesapeake. Plaintiffs have not made separate arrangements to dispose of their shares of production, so the unit operator can sell the shares but must pay the owners a pro rata share of the proceeds within one hundred eighty days of the sale. La. Stat. Ann. § 30:10(A)(3) (2022). Chesapeake has been paying the pro rata share of production but has been withholding from that amount the pro rata post-production costs for transporting, gathering, marketing, treating, and compressing produced minerals, as well as amounts related to minimum volume commitments or capacity reservation fees. Plaintiffs alleged, that the practice of withholding the post-production costs from their pro rata share of production is improper *per se. See Johnson v. Chesapeake La., L.P.*, No. CV-16-1543, 2019 WL 1301985 (W.D. La. Mar. 21, 2019), *vacated on reconsideration*, 2022 WL 989341.

Chesapeake timely removed this action to the district court, based on diversity jurisdiction. 28 U.S.C. §§ 1332(a). Chesapeake sought dismissal of the Plaintiffs' primary claim that Chesapeake can never deduct post-production costs incurred in the sale of unleased mineral owners' pro rata shares of production. The district court granted Chesapeake's motion for reconsideration and held that the Louisiana Civil Code doctrine of *negotiorum gestio* provides a mechanism for unit operators to be reimbursed for post-production costs not otherwise covered by specific statutes. La. Civ. Code Ann. art. 2292 (2023). The district court certified its ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This court granted

_____

relief, and permanent injunctive relief to prohibit Chesapeake from deducting any post-production costs from plaintiffs' *pro rata* share of production proceeds as *per se* illegal, is now at issue.

3

No. 22-30302

the Plaintiffs' motion for leave to appeal from an interlocutory order. This court took up the appeal.

## II

We review a district court's grant of summary judgment *de novo*. *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014). Summary judgment is appropriate only when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The sole question is whether a 'reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor.'" *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)).

On cross-motions for summary judgment, we review each party's motion independently. All evidence and inferences are viewed in the light most favorable to the nonmovant. *Amerisure Inss. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010). The district court's denial of a motion for reconsideration is reviewed for an abuse of discretion. *See Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 329 (5th Cir. 2017). "The trial court is free to consider and reverse its decision for any reason it deems sufficient." *Id.* at 336.

## III

Louisiana is one of many states with forced pooling laws designed to prevent the waste of mineral resources. These laws provide mechanisms for sharing both the risks and benefits of production in the absence of a contract. *TDX Energy, LLC v. Chesapeake Operating, Inc.*, 857 F.3d 253, 257 (5th Cir. 2017). Accordingly, the forced pooling law allows the recovery of certain costs:

No. 22-30302

> In the event a drilling unit is formed by a pooling order by the commissioner and absent any agreement or contract between owners as provided in this Section, then the cost of development and operation of the pooled unit chargeable to the owners therein shall be determined and recovered as provided herein.

La. Stat. Ann. § 30:10(A)(2) (2022).

Louisiana law and the oil and gas industry in general recognize a distinction between production and post-production costs. Production costs end "at the wellhead when the minerals are reduced to possession. Post-production costs . . . include those related to taxes, transportation, dehydration, treating, compressing, and gathering." *J. Fleet Oil & Gas Corp. v. Chesapeake La., L.P.,* No. CV-15-2461, 2018 WL 1463529, at *6 (W.D. La. Mar. 22, 2018) (citation omitted). The provision addressing recovery of costs mentions only certain types of production costs: "drilling, testing, completing, equipping, and operating expenses," as well as a charge for supervision. *See* La. Stat. Ann. § 30:10(A)(2)(b)(i) (2016). It is silent as to post-production costs. Most relevant here is La. Stat. Ann. § 30:10(A)(3), which addresses payment of production proceeds:

> If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.

La. Stat. Ann. § 30:10(A)(3) (2022).

The Plaintiffs contend that "proceeds" of the sale here mean "gross proceeds." Chesapeake countered initially that "proceeds" is ambiguous

and should be interpreted to mean "net proceeds," after deduction of pro rata post-production costs. Chesapeake later contended, however, that when section (A)(3) is properly harmonized with Louisiana's civil code regime, there is a legal mechanism to support the deductibility of post-production costs: the quasi-contractual regime of *negotiorum gestio.*

The Louisiana Supreme Court has held, and the parties agree, that the relationship between them is quasi-contractual. *Wells v. Zadeck*, 89 So. 3d 1145, 1149 (La. 2012) ("A quasi-contractual relationship is created between the unit operator and the unleased mineral interest owner with whom the operator has not entered into contract."). The parties disagree, though, as to what type of quasi-contractual relationship they have. The Louisiana Code provides two non-exclusive examples that give rise to quasi-contractual obligations in the state: *negotiorium gestio* and enrichment without cause. La. Civ. Code Ann. art. 2292, 2298 (2023); Louisiana is the only state that employs *negotiorium gestio*, and it has "deep roots" in the state. Under this doctrine, a proposed "*gestor*" must act 1) voluntarily and without authority, 2) to protect the interests of another, and 3) in the reasonable belief that the owner would approve of the action if made aware of the circumstances. La. Civ. Code Ann. art. 2292 (2023). If *negotiorum gestio* applies, Louisiana Civil Code Article 2297 requires "[t]he owner whose affair has been managed [to] . . . fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses." La. Civ. Code Ann. art. 2297 (2023).

Plaintiffs assert that Chesapeake cannot be a *gestor* because it did not act "voluntarily and without authority"; it acted pursuant to a statutory duty. Plaintiffs also contend that Chesapeake did not act exclusively to protect the unleased mineral owners' interests, but rather to protect its own interests. If *gestio* principles are applicable, Plaintiffs assert, a factfinder

would need to determine that Chesapeake always acted for the plaintiffs' benefit in marketing unit production before Chesapeake would be entitled to reimbursement under Article 2297.

Chesapeake contends that Louisiana case law recognizes it as a *gestor* in all circumstances when dealing with unleased mineral owners, but the parties agree that no controlling case deals with the specific facts at hand. In *Taylor v. Smith*, the Louisiana Third Circuit Court of Appeal held that a cause of action under section 30:10(A)(3) of the Louisiana Revised Statutes should be construed together with the Civil Code's *negotiorum gestio* doctrine. 619 So. 2d 881, 887 (La. App. 1993) ("The statute gives the owner a cause of action in quasi-contract under LSA-C.C. art. 2292, et. seq., insofar as the operator, in selling the owner's proportionate share of the oil produced, is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced."). The Louisiana Supreme Court cited *Taylor* in *Wells*, where it held that the relationship between an unleased mineral interest owner and operator is quasi-contractual. *Wells*, 89 So. 3d at 1149 (citing *Taylor*, 619 So. 2d 881). Yet that case involved the proper prescriptive period for an action brought under section (A)(3) and did not directly reference the part of *Taylor* discussing *gestores*. Thus, no controlling Louisiana case resolves the parties' issue.

This unsettled state of the law raises the question whether the appropriate course is to certify the issue for resolution by the state court of last resort. The rules of the Louisiana Supreme Court allow for certification from the federal courts of appeals of dispositive questions of Louisiana law. La. Sup. Ct. R. 12, §§ 1–2 (2023). The issue presented here satisfies that condition.

The issue presented also satisfies the three factors used by this court in deciding whether to certify:

1) [T]he closeness of the question and the existence of sufficient sources of state law;

2) [T]he degree to which considerations of comity are relevant in light of the particular issue and case to be decided; and

3) [P]ractical limitations on the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.

*In re Gabriel Inv. Grp.*, 24 F.4th 503, 507 (5th Cir. 2022); *see also Austin v. Kroger Tex. LP*, 746 F.3d 191, 196 (5th Cir. 2014). As explained above, Louisiana law is unsettled on this issue. "[A]ny *Erie* guess would involve more divining than discerning." *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 202 (5th Cir. 2020). The Louisiana Third Circuit Court of Appeal and the district court in this case both concluded that the *negotiorum gestio* doctrine applies. But the scholarly dissent provides cogent reasons to think it does not. And the district court concluded that the issue was sufficiently close to certify its ruling for interlocutory appeal.

Comity interests also favor certification. The interplay between Louisiana's oil and gas law and its unique *negotiorum gestio* doctrine presents a complex and novel issue "peculiarly calling for the exercise of judgment by the [Louisiana] courts." *McKesson v. Doe*, 141 S. Ct. 48, 51 (2020). "Speculation by a federal court" about how to square Louisiana's new conservation laws with its ancient civilian doctrines is inappropriate "when . . . the state courts stand willing to address questions of state law on certification." *Arizonans for Official Eng. v. Arizona*, 520 U.S. 43, 79 (1997) (internal quotation marks and alteration omitted). Finally, we are unaware of any practical impediments to certification.

No. 22-30302

\*  \*  \*

Accordingly, we CERTIFY the following determinative question of law to the Louisiana Supreme Court:

1) Does La. Civ. Code art. 2292 apply to unit operators selling production in accordance with La. R.S. 30:10(A)(3)?

We disclaim any intention or desire that the Louisiana Supreme Court confine its reply to the precise form or scope of the question certified. We will resolve this case in accordance with any opinion provided on this question by the Court. The Clerk of this Court is directed to transmit this certification and request to the Louisiana Supreme Court in conformity with the usual practice.

QUESTION CERTIFIED.

No. 22-30302

James L. Dennis, Circuit Judge, *dissenting*:

This case is straightforward. La. R.S. 30:10(A)(3), part of Louisiana's oil and gas conservation law, allows a unit operator to unilaterally sell production under specific conditions and imposes a specific duty of repayment to the owner. *Negotiorum gestio*, by contrast, is a traditional civilian doctrine, codified at La. Civ. Code art. 2292, that allows one person to manage the property of another if certain circumstances are met. Not only are La. R.S. 30:10(A)(3) and article 2292 distinct legal regimes with different requirements and different duties, they are necessarily incompatible. A unit operator who sells an owner's production under the statutory authority of La. R.S. 30:10(A)(3) cannot be a *gestor* as defined in article 2292, because a *gestor*, as the codal article provides, is one who acts "without authority." In certifying the question of whether a unit operator acting under the authority of § 30:10(A)(3) may simultaneously act as a *gestor* under article 2292, the majority disregards not only the plain text of article 2292 but also basic rules of statutory interpretation. Because the answer is clear that *negotiorum gestio* cannot apply, I find certification to the Louisiana Supreme Court inappropriate. I respectfully dissent.[1]

## I.

Title 30 of the Louisiana Revised Statutes includes a comprehensive regime for the conservation of the state's oil and gas during extraction. The Commissioner of Conservation, for the prevention of waste and to avoid the drilling of unnecessary wells, is vested with authority to establish a drilling unit for each pool of underground oil or gas. *B.A. Kelly Land Co. v. Aethon*

---

[1] This dissent reflects the same reasons I dissented from certification of the identical issue in *Self v. BPX Operating Co.*, 80 F.4th 632, 637-41 (5th Cir. 2023) (Dennis, J., dissenting).

10

*Energy Operating, L.L.C.*, 25 F.4th 369, 374 (5th Cir. 2022) (citing La. R.S. 30:9(B)). The Commissioner "has the plenary authority to declare drilling and production units, to force pool neighboring tracts and leases into a single unit, to designate a single well and operator for the unit, and to allocate production from the unit well to each participating tract and lease—all for the purpose of conserving resources, avoiding waste, and eliminating unnecessary wells." *Peironnet v. Matador Res. Co.*, 2012-2292, p. 42 (La. 6/28/13), 144 So. 3d 791, 822 (citing La. R.S. 30:4, 9, 10).

The designated unit operator has several duties. The operator is charged with drilling within the unit and paying a proportionate share of production to the owners of mineral interests in the unit. *B.A. Kelly*, 25 F.4th at 275 (citing *T D X Energy, L.L.C. v. Chesapeake Operating, Inc.*, 857 F.3d 253, 257 (5th Cir. 2017)). However, if an unleased owner is included in the unit, as relevant here, the law authorizes the unit operator to instead sell the share of production owed to the unleased owner and provide the owner the proceeds within 180 days. La. R.S. 30:10(A)(3). Louisiana law also imposes a duty on operators to report information to unleased owners if requested. *B.A. Kelly*, 25 F.4th at 375-76 (citing La. R.S. 30:103.1).

"In both voluntary and compulsory unitization, well cost disputes arise. When there is an operating agreement [i.e. a contract or mineral lease] among the parties, such disputes are generally addressed in the agreement." *Id.* at 375 (alteration in original) (quoting 1 Bruce M. Kramer & Patrick H. Martin, The Law of Pooling and Unitization § 14.04 (3d ed. 2016)). But, in a "forced pooling" regime, the statute itself "'has to address a number of issues that contracts usually decide, such as how to allocate costs and risk among those holding interests in the oil and gas,' and how the operator should provide an accounting of well production and costs to owners of oil and gas interests." *Id.* (quoting *T D X Energy, L.L.C.*, 857 F.3d at 256). When the operator proposes to drill a well in a

11

No. 22-30302

unit, it may give notice to owners of oil and gas interests within the unit, allowing owners to elect to participate in the risk by contributing to the drilling costs up front. *Id.* (citing *T D X Energy, L.L.C.*, 857 F.3d at 258). If an owner does not participate and the well produces, the operator may recover out of production the nonparticipating interest owner's share of "expenditures incurred in drilling, testing, completing, equipping, and operating the well," and, in certain cases and except in the case of an unleased mineral owner, a "risk charge" of two hundred percent of the owner's drilling expenditure share. LA. R.S. 30:10(A)(2)(b)(i), (e)(i); *B.A. Kelly*, 25 F.4th at 275. However, if an operator fails to timely comply with an unleased mineral owner's request for reporting and also fails to cure its default within thirty days of receiving notice of such failure from the unleased owner, then the operator cannot collect from the owner "the costs of the drilling operations of the well." LA. R.S. 30:103.2; *B.A. Kelly*, 25 F.4th at 276.

The statute does not specifically address whether a unit operator may deduct post-production costs—those costs after the minerals are reduced to possession, including costs related to taxes, transportation, dehydration, treating, compressing, and gathering. *See J. Fleet Oil & Gas Corp. v. Chesapeake La., L.P.,* No. CV-15-2461, 2018 WL 1463529, at *6 (W.D. La. Mar. 22, 2018). Unit operators like the Defendant in this case have raised several arguments for why they ought to be allowed to deduct post-production costs in the absence of a lease providing as much, but the only argument before us is the applicability of *negotiorum gestio* to the sale of an unleased mineral owner's share of production under LA. R.S. 30:10(A)(3).

No. 22-30302

## II.

As noted, part of Louisiana's oil and gas conservation law, LA. R.S. 30:10(A)(3), authorizes the unit operator to unilaterally sell the share of production owed to an unleased mineral owner. Section 30:10(A)(3) applies when there is 1) a unit created by the Commissioner of Conservation 2) which includes one or more unleased interests 3) for which the party entitled to market production therefrom has not made arrangements to separately sell or otherwise dispose of the share of such production attributable to such tract, and 4) the unit operator sells or otherwise disposes of such unit production. Then, the unit operator must pay to such party its pro rata share of the proceeds within 180 days. *Id.* This relationship is quasi-contractual. *Wells v. Zadeck*, 2011-1232, p. 6 (La. 3/30/12), 89 So. 3d 1145, 1149. The purpose of this relationship is to "facilitate[] the sale of minerals." *See King v. Strohe*, 95-656, p. 17 (La. App. 3 Cir. 5/8/96), 673 So. 2d 1329, 1338.

On the other hand, *negotiorum gestio*—or management of affairs—"is a typically civilian institution that derives from the Romanist tradition and is found in all civil codes." LA. CIV. CODE art. 2292 cmt. (a). *Negotiorum gestio* applies when a person, the manager or *gestor*, acts 1) without authority, 2) to protect the interests of another, and 3) in the reasonable belief that the owner would approve of the action if made aware of the circumstances. LA. CIV. CODE art. 2292. The *gestor* must have "undertake[n] the management with the 'benefit' of the owner in mind" and not have "act[ed] in [its] own interest or contrary to the actual or presumed intention of the owner." *Id.* cmts. (c)-(d); *see also Johnco, Inc. v. Jameson Ints.*, 98-1925, pp. 5-6 (La. App. 3 Cir. 6/23/99), 741 So. 2d 867, 870; *Kirkpatrick v. Young*, 456 So. 2d 622, 624-25 (La. 1984). These requirements generally "depend[] on facts." *Woodlief v. Moncure*, 17 La. Ann. 241, 242 (La. 1865); *see also Bank of the S. v. Fort Lauderdale Tech.*

13

*Coll., Inc.*, 301 F. Supp. 260, 261 (E.D. La. 1969). Only if all these requirements are met does a person qualify as a *gestor* such that "[t]he owner whose affair has been managed is bound to fulfill the obligations that the manager has undertaken as a prudent administrator and to reimburse the manager for all necessary and useful expenses." LA. CIV. CODE art. 2297. *Negotiorum gestio* is "rooted in altruism," and its purpose is to "encourage people to assist friends and neighbors in need." *See* Cheryl L. Martin, *Louisiana State Law Institute Proposes Revision of* Negotiorum Gestio *and Codification of Unjust Enrichment*, 69 TUL. L. REV. 181, 186-87, 193 (1994).

"The general rule of statutory construction is that a specific statute controls over a broader, more general statute." *Burge v. Louisiana*, 2010-2229, p. 5 (La. 2/11/11), 54 So. 3d 1110, 1113. This rule has been especially true regarding Louisiana's oil and gas conservation law, modern statutes intended to alter and override general legal principles that were inadequate for mineral production and conservation.

The prime example is *Nunez v. Wainoco Oil & Gas Co.*, 488 So. 2d 955 (La. 1986). In that case, a landowner within a drilling unit sued the unit operator for trespass because a well bore crossed onto his property several miles below the surface while drilling for oil. *Id.* at 956-58. The court held that "private property law concepts, such as trespass, have been superceded in part by Louisiana's Conservation Law when a unit has been created by order of the Commissioner." *Id.* at 964. To begin, the court recounted the developments in Louisiana's oil and gas conservation law, from the initial "rule of capture" that resulted in "haste, inefficient operations, and immeasurable waste within the ground and above" to the present method of forced pooling into drilling units, which "was found to convert separate interests within the drilling unit into a common interest with regard to the development of the unit and the drilling of the well." *Id.*

at 960-62. This change marked a "departure from the traditional notions of private property," and the court "conclude[d] that the established principles of private ownership, already found inadequate in Louisiana to deal with the problems of subsurface fugacious minerals, need not necessarily be applied to other property concepts, like trespass, within a unit." *Id.* at 962-63 (quoting *Mire v. Hawkins,* 186 So. 2d 591, 596 (La. 1966)). Thus, the court "h[e]ld that the more recent legislative enactments of Title 30 and Title 31 supercede in part La.Civ.Code Ann. art. 490's general concept of ownership of the subsurface by the surface owner of land." *Id.* at 964. Importantly, the court noted that this scheme not only changed general property principles but also other "legal relationships between landowners and lessees within the unit." *Id.* at 963; *see also Amoco Prod. Co. v. Thompson*, 516 So. 2d 376, 393 (La. App. 1 Cir. 1987) (holding the oil and gas conservation law is "*sui generis*"); *Teekell v. Chesapeake Operating, Inc.*, No. 12-0044, 2012 WL 2049922, at *4 (W.D. La. June 6, 2012) ("The *Nunez* opinion makes it clear that unitization changes the property rights and obligations of landowners."); *Peironnet*, 2012-2292, at p. 42, 144 So. 3d at 822 ("When such units are created, the operations of the designated operator constitute operations for all lessees participating in the unit, and the orders of the Commissioner creating said units supersede, supplement, replace and are incorporated in the provisions and obligations of the leases subject thereto.").

As in *Nunez*, here, the legislature has prescribed a specific quasi-contractual relationship between unleased mineral owners and unit operators under LA. R.S. 30:10(A)(3) as part of the oil and gas conservation law. This relationship is separate from *negotiorum gestio* under LA. CIV. CODE art. 2292, as each has distinct and specific requirements and duties. The mere fact that each relationship is quasi-contractual does not make them the same, as a quasi-contractual obligation is simply one that

"arise[s] directly from the law, regardless of a declaration of will." *See* LA. CIV. CODE art. 1757 (emphasis added) (noting a nonexclusive list of quasi-contractual obligations "in instances *such as* . . . the management of the affairs of another . . . and *other acts or facts*"); *see also* Martin, *supra*, at 184 (noting the term "quasi-contract" does not appear anywhere in the Civil Code but is "simply a shorthand method for distinguishing this particular type of obligation from a contract").

In addition to these two relationships being distinct, we cannot apply them both to a unit operator without conflict. As stated, a *gestor* must act "without authority." LA. CIV. CODE art. 2292. In that way, "[m]anagement of another's affairs pursuant to a legal duty does not give rise to an action under *negotiorum gestio*." *See Kilpatrick v. Kilpatrick*, 27,241, p. 9 (La. App. 2 Cir. 8/23/95), 660 So. 2d 182, 187. During the 1995 revision of the Civil Code articles governing *negotiorum gestio*, the legislature replaced the requirement that the *gestor* act "of his own accord" with the requirement that the *gestor* act "without authority" to make clear that the requirement is not merely voluntariness but "an absence of authority altogether," including authority granted by statute—appropriate for a doctrine rooted in pure altruism. Martin, *supra*, at 189-90 (discussing examples of statutory grants of authority that eliminate *negotiorum gestio* as a theory of recovery after the revision). Here, however, the unit operator does not act without authority. To the contrary, the unit operator is specifically authorized to sell an unleased mineral owner's share of production under LA. R.S. 30:10(A)(3). *Cf.* Martin, *supra*, at 189-90 ("[A] co-owner has authority to manage that which is co-owned [under LA. CIV. CODE art. 802]. Therefore, the phrase 'without authority' clearly eliminates *negotiorum gestio* as a basis for liability among co-owners."). Following the rules of statutory interpretation, we must "give meaning to every word in the statute" and cannot "read out of the statute" the elements one must

prove to qualify as a *gestor*, including that one must act without authority. *See Bergeron v. Richardson*, 2020-01409, p. 5 (La. 6/30/21), 320 So. 3d 1109, 1113. Because we cannot apply the two statutes together consistently, only the specific one applicable to conservation applies. *See Burge*, 54 So. 3d at 1113; *Nunez*, 488 So. 2d at 962-63.[2]

*Taylor v. Smith*, 619 So. 2d 881, 887-88 (La. App. 3d Cir. 1993), relied on by the majority, did not hold otherwise. The only issue before the court in *Taylor* was whether the liberative prescription period applicable to actions in tort or the one applicable to actions in quasi-contract applied to an action by an unleased mineral owner seeking to recover proceeds under La. R.S. 30:10(A)(3). *Id.* at 885-88. Because the obligation of the unit operator was "imposed 'without any agreement' but instead, 'imposed by the sole authority of the laws,'" the court found the "cause of action against the unit operator sounds in quasi-contract and is subject to a liberative prescription of ten (10) years." *Id.* at 888. While the court elsewhere stated, without analysis, that a unit operator "is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced," that statement was dicta unnecessary to the court's holding. To the extent the court did hold *negotiorum gestio* applied, it did so before the legislative amendment, discussed above, that clarified a *gestor* is only one

---

[2] I also note a *gestor* must act "to protect the interests of another . . . in the reasonable belief that the owner would approve of the action if made aware of the circumstances," La. Civ. Code art. 2292, meaning the *gestor* must have "undertake[n] the management with the 'benefit' of the owner in mind" and not have "act[ed] in [its] own interest or contrary to the actual or presumed intention of the owner," *id.* cmts. (c)-(d); *see also Johnco*, 98-1925, at pp. 5-6, 741 So. 2d at 870; *Kirkpatrick*, 456 So. 2d at 624-25. It is highly doubtful a unit operator like the Defendant did so when selling the Plaintiffs' share of production. However, that is a question of fact on which the Defendant has the burden of proof. *See Woodlief*, 17 La. Ann. at 242; *Bank of the S.*, 301 F. Supp. at 261.

No. 22-30302

who acts "without authority," including statutory authority. LA. CIV. CODE art. 2292; Martin, *supra*, at 189-90. This amendment abrogated what the majority mistakenly believes is the holding in *Taylor*, that *negotiorum gestio* may apply to a unit operator acting under the authority of LA. R.S. 30:10(A)(3).

\* \* \*

Because the oil and gas conservation law provides a unique quasi-contractual relationship between unleased mineral owners and unit operators under LA. R.S. 30:10(A)(3) and this relationship cannot be applied consistently with *negotiorum gestio* under LA. CIV. CODE art. 2292, utilizing basic rules of statutory interpretation, we should apply only the specific provision under § 30:10(A)(3). With the proper outcome in this case clear, certification to the Louisiana Supreme Court is unwarranted.

I respectfully dissent.

**A True Copy**
**Certified Nov 27, 2023**

*Tyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

18