# United States Court of Appeals
## for the Fifth Circuit

_____

No. 22-30379

_____

United States Court of Appeals
Fifth Circuit

**FILED**
June 9, 2025

Lyle W. Cayce
Clerk

Dow Construction, L.L.C.,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

B P X Operating Company,

*Defendant—Appellant/Cross-Appellee*.

_____

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:20-CV-9

_____

Before Clement, Graves, and Higginson, *Circuit Judges*.
James E. Graves, Jr., *Circuit Judge*:

Under Louisiana law, the Commissioner of Conservation may join separate tracts of land into a forced pooled drilling unit. After doing so, the Commissioner appointed BPX Operating Company to operate one of these units, which included a property leased by Dow Construction, L.L.C. When Dow received its share of the proceeds, post-production costs had been deducted. Dow took issue with that and sought judgment awarding it the operator-deducted post-production costs. In turn, BPX sought dismissal and summary judgment for varied reasons.

No. 22-30379

The district court held that: Dow had standing to sue, the Louisiana doctrine of *negotiorum gestio* allows for operators to recover post-production costs, the forced-pooling statute's forfeiture provision—La. Rev. Stat. § 30:103.2—includes post-production costs, and claims under § 30:103.2 are subject to a ten-year prescriptive period. We AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.

## I.

## A.

Louisiana is one of many states that has forced pooling laws. Under its scheme, Louisiana's Commissioner of Conservation may join separate tracts of land into a forced drilling unit "whenever necessary to prevent waste or avoid needless drilling, even if owners of oil and gas interests have not agreed to pool their interests."[1] *TDX Energy, L.L.C. v. Chesapeake Operating, Inc.*, 857 F.3d 253, 257 (5th Cir. 2017) (citing La. Rev. Stat. §§ 30:9(B), 30:10(A)(1)). This is to "afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool." La. Rev. Stat. § 30:10(A)(1)(a) (2019).

Once a unit has been established, the Commissioner appoints an operator, and the "operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any

---

[1] La. Rev. Stat. § 30:9(B) provides that:

For the prevention of waste and to avoid the drilling of unnecessary wells, the commissioner shall establish a drilling unit or units . . . . A drilling unit, as contemplated herein, means the maximum area which may be efficiently and economically drained by the well or wells designated to serve the drilling unit . . . . This unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil, gas, or brine in paying quantities.

acreage on which the *operator* does not have an oil and gas lease." *TDX Energy*, 857 F.3d at 257–58 (emphasis added) (citing LA. REV. STAT. § 30:10(A)(1)(b)).

Nonoperators also share in certain drilling risks and costs. *Id.* at 258. "Each oil and gas interest owner is responsible for a share of development and operation costs." *Id.* (citing LA. REV. STAT. § 30:10(A)(2)). "To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs." *Id.*

After the operator sends notice to specific owners, those owners may choose to "participate in the risk by contributing to drilling costs up front" or opt out and be subject to a risk charge, which the operator may deduct from the non-participating interest owners' share of production after sale. *Id.* (citing LA. REV. STAT. §§ 30:10(A)(2)(a)(i), (b)(i)). Completely unleased owners, however, are not subject to this risk charge. *Id.* at 263 (citing LA. REV. STAT. § 30:10(A)(2)(e)).

At unleased owners' request, operators must issue reports containing sworn statements about the drilling and operating costs, amount of production, and price received for sale of production. *See* LA. REV. STAT. § 30:103.1 (2019). When an operator does not provide this information within ninety days of completing a well, and thirty additional days lapse after receiving notice of its failure to comply with its reporting obligation, the operator forfeits its right to demand contribution for the costs of the drilling operations. *Id.* § 30:103.2 (2019).

## B.

The instant dispute involves BPX, the operator of the HA RA SUE drilling unit, in which Dow leases property. Dow sent a request for well cost information to Petrohawk Operating Company, the previous operator of the unit, pursuant to § 30:103.1(A). But Petrohawk, failed to adequately respond

to the initial demand. Dow then sent a second demand for an accounting of costs, which Petrohawk ignored. BPX then became Petrohawk's successor-in-interest.

Thereafter, Dow filed a petition in Louisiana state court seeking a judgment awarding it the operator-deducted post-production costs. The action was then removed to federal district court.

Dow argued that BPX "forfeited any right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well." Further, Dow alleged that BPX improperly deducted post-production costs from Dow's proceeds because post-production costs may not be assessed under La. Rev. Stat. § 30:10.

BPX filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that § 30:10(A)(3) did not apply to lessees like Dow because the provision only applies to forced pooled-unit interests that are not subject to any mineral lease. The district court denied BPX's motion, holding that § 30:10(A)(3) applied "to any mineral interest owner in a forced pool unit who has no lease with the operator." BPX filed a motion for reconsideration that the district court denied.

BPX then moved for summary judgment. The district court granted the motion in part and denied it in part. As to the first issue, the district court held that the Louisiana doctrine of *negotiorum gestio* allows for operators to recover post-production costs incurred by an operator to market the mineral interest owner's share of production. As to the second, the court concluded that post-production costs are included within § 30:103.2's forfeiture provision.

BPX also filed a separate motion to dismiss, arguing that any claim made under § 30:103.2 was subject to a one-year prescriptive period that had lapsed. The district court denied the motion, finding that claims under

§ 30:103.2 are quasi-contractual and personal and, as a result, are subject to a ten-year prescriptive period. That same day the district court granted BPX's motion for certification to permit this interlocutory appeal.

## II.

We review dismissals pursuant to Rule 12(b)(6) *de novo*, accepting all well-pleaded factual allegations as true. *Alexander v. Verizon Wireless Servs., L.L.C.*, 875 F.3d 243, 249 (5th Cir. 2017). We also review the district court's grant of summary judgment *de novo*. *Ibarra v. UPS*, 695 F.3d 354, 355 (5th Cir. 2012).

## III.

We have been presented with four questions for review: A) whether § 30:10(A)(3) applies to any mineral interest owner in a forced pool unit who has no lease whatsoever or who specifically has no lease with the operator of the well; B) whether § 30:10 precludes operators from seeking reimbursement of post-production costs incurred by operators when they market an unleased owner's share of production; C) whether post-production costs are included within the forfeiture provision, § 30:103.2; and D) whether § 30:103.2 is subject to a one-year or ten-year perspective period. We address them in turn.

But first, a note on methodology. In diversity cases like this one we apply state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In the absence of a final decision by the Louisiana Supreme Court, we make an *Erie* guess and determine, in our best judgment, how it would resolve the issue if presented with the same case. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

In making an *Erie* guess, we employ Louisiana's civilian methodology and first examine primary sources of law: the constitution, codes, and

statutes. *Id.* Pursuant to Louisiana Civil Code article 9, "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." LA. CIV. CODE ANN. art. 9. However, when a statute is ambiguous, which is when its language is open to different interpretations, "it must be interpreted as having the meaning that best conforms to the purpose of the law." LA. CIV. CODE ANN. art. 10. In other words, a law's meaning "is determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker in enacting it." *Sultana Corp. v. Jewelers Mut. Ins. Co.*, 2003-0360, p. 4 (La. 12/3/03); 860 So. 2d 1112, 1116 (La. 2003) (citing *In re Succession of Boyter*, 1999-0761, p. 9 (La. 1/7/00); 756 So. 2d 1122, 1129).

## A.

In addressing the proper interpretation of § 30:10(A)(3) and to whom it applies, we begin with the text:

> If there is included in any unit created by the commissioner of conservation one or more *unleased interests* for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.

LA. REV. STAT. § 30:10(A)(3) (2019) (emphasis added).

The dispute centers on the meaning of "unleased interests." According to BPX, § 30:10(A)(3) is inapplicable here because it only applies

to interest owners who have no lease *at all*. In BPX's view, since it is undisputed that Dow is a lessee of an interest within the Unit, Dow is not covered by § 30:10(A)(3). Dow disagrees. In its view, the term "unleased interests," as used in the statute, refers to interests unleased *by the well operator*. Since Dow has no lease with BPX, it contends it is covered by § 30:10(A)(3).

At first glance, unleased interests may seem unambiguous, but that is not so. We have previously noted that "Title 30 uses 'unleased interests' to mean different things in different chapters." *TDX Energy*, 857 F.3d at 262. Depending on the context, Title 30 refers to interests that are completely unleased or unleased only in relation to the well operator. Put simply, the phrase itself does not resolve this question.

For insight, we must look to the context in which the phrase is used. *See* LA. CIV. CODE art. 12 (noting that when the words of a law are ambiguous, courts must examine the context in which they occur and the text of the law as a whole); *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion) ("[T]he same words, placed in different contexts, sometimes mean different things.").

The phrase "unleased interest" is used twice in § 30:10. First, § 30:10(A)(2)(e)(i) provides that "[t]he provisions of Subparagraph (b) of this Paragraph with respect to the risk charge shall not apply to any unleased interest not subject to an oil, gas, and mineral lease." Second, § 30:10(A)(3), the provision at issue here, provides: "If there is included in any unit . . . one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production . . . ."

These multiple uses of the phrase are illuminating. BPX posits that "unleased interests" means just that throughout the statute—not subject to

*any* lease. But that reading of "unleased interest" would make no sense in § 30:10(A)(2). If "unleased interest" meant "not subject to any lease whatsoever," then the Louisiana legislature adding the exclusionary phrase "not subject to an oil, gas, and mineral lease" right after would be superfluous. *TDX Energy*, 857 F.3d at 262. Canons of statutory interpretation counsel against reading the statute as BPX would have us do. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quotations omitted)).

BPX's reading would not only render language in § 30:10(A)(2) superfluous but also create the same problem in § 30:10(A)(3). As the district court explained:

> Mineral leases with a landowner typically assign the right to market production. Thus, a landowner lessee, like Dow, becomes the "party or parties entitled to market production" and who has "not made arrangements" to take its interest in kind. If the Legislature intended to limit this provision of the statute to the completely unleased interest, the descriptive phrase would be unnecessary and superfluous because the landowner of the completely unleased interest would always be the "party or parties entitled to market production." *The only purpose this phrase serves is to include any party who has or has acquired the right to market production of an interest unleased by the operator.*

*Dow Constr., LLC v. BPX Operating Co.*, 564 F. Supp. 3d 479, 486 (W.D. La. 2021) (emphasis added).

Other than creating issues in the statutory text that otherwise do not exist, BPX's reading would undermine the intent of the legislature. "[W]hen an owner or operator drills a well, and that owner or operator has no valid oil,

gas, or mineral lease on a portion of that land, the mineral lessee of those portions not leased by the operator or producer of the well has a claim to demand an accounting pursuant to La.R.S. 30:103.1, as an owner of a valid oil, gas, or mineral lease." *XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, 2016-269, pp. 3–4 (La. App. 3 Cir. 9/28/16); 206 So. 3d 885, 888. The stated statutory purpose of mandatory pooling is to afford the mineral interest owner of each tract "the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense." LA. REV. STAT. § 30:10(A)(1)(a) (2019). However, as highlighted by the district court, under BPX's narrow interpretation, the statute would treat unleased mineral owners differently depending upon the point at which their operators choose to sell the unit production. Given the parties' obligations to pay costs and share in the production, unleased owners would be able to "free ride" and the others would be saddled with unnecessary expenses. This windfall for some and shortfall for others would make little sense given the relevant policies at issue. *See TDX Energy*, 857 F.3d at 256–58 (noting that the statutory scheme creates a mechanism for sharing risk to prevent free riding); *Taylor v. Smith*, 619 So. 2d 881, 887 (La. App. 3 Cir. 6/2/93) ("In a situation, as in this case, where there is no written agreement between the owner and operator, LSA-R.S. 30:10(A)(3) has supplied the terms of the contract.").

To counter this conclusion, BPX cites *King v. Strohe*, 95-656 (La. App. 3 Cir. 5/8/96); 673 So. 2d 1329. In its view, *King* is "on-point authority." We disagree. There, the plaintiff had a servitude that granted her mineral and water rights to the subject property. The plaintiff leased those rights to a company and was therefore a lessor. *King* thus has limited applicability in this case.

Instead of reading the term as BPX would have us do—rendering statutory text superfluous and undermining legislative intent in the

process—we read "unleased interests" to mean unleased as to the operator. After all, § 30:10(A)(3) is "addressed to the operator, and it makes sense that [it] would use 'unleased interest' to mean interests unleased by the operator." *TDX Energy*, 857 F.3d at 262. This conclusion is also consistent with our precedent. *Id.* at 259–60 ("The only appellate court in Louisiana to address whether sections 103.1 and 103.2 give rights just to owners of wholly unleased interests or owners of interests not leased to the operator followed the latter, more expansive view."). We accordingly AFFIRM the district court's holding that § 30:10(A)(3), properly read, applies to mineral interest owners who are unleased as to the operator.

### B.

We turn to post-production costs. BPX argued, and the district court concluded, "that the doctrine of *negotiorum gestio*—pursuant to Louisiana Civil Code article 2292, *et seq.*—allows operators the mechanism and ability to recover post-production costs incurred by an operator to market the mineral interest owner's share of production."

In another case in which BPX was a party before this court, this court certified a question to the Louisiana Supreme Court asking "whether the doctrine of *negotiorum gestio* applies to unit operators selling product in accordance with La. R.S. 30:10(A)(3)." *Self v. BPX Operating Co.*, 2023-01242, p. 3 (La. 6/1/24); 388 So. 3d 366, 368, *reh'g denied*, 2023-01242 (La. 8/2/24); 389 So. 3d 828 (discussing *Self v. BPX Operating Co.*, 80 F.4th 632 (5th Cir. 2023)). The Louisiana Supreme Court held that "*negotorium gestio* does not apply and cannot be a basis for liability." *Id.* It reasoned that "[a] party is only a *gestor* if his action is taken 'without authority.'" *Id.* (quoting La. Civ. Code art. 2292). "A unit operator who sells an owner's production under the statutory authority of La. R.S. 30:10(A)(3) cannot therefore be a *gestor* under La. C.C. art. 2292 as a *gestor* is one who acts

'without' authority.'" *Id.* at 369 (quoting *Self*, 80 F.4th at 637 (DENNIS, J., dissenting)).

Given the Louisiana Supreme Court's holding, in *Self* we vacated the district court's order as inconsistent with now-established Louisiana law and remanded for further proceedings consistent with the Louisiana Supreme Court's opinion. *Self v. BPX Operating Co.*, No. 22-30243, 2024 WL 4273824 (5th Cir. Sept. 19, 2024) (per curiam). We do the same here. We VACATE the district court's order insofar as it granted BPX partial summary judgment based on the holding that *negotiorum gestio* allows operators to recover post-production costs incurred to market the mineral interest owner's share of production, and REMAND for further proceedings consistent with the Louisiana Supreme Court's opinion.

## C.

Next, we take up whether post-production costs are included within § 30:103.2, the forfeiture provision. Section 103.2 provides that when an operator fails to timely provide the information required of them by § 30:103.1, the operator loses the "right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well." *Id.* § 30:103.2 (2019).

Section 103.1, in turn, provides that:

A. Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas, or mineral lease, said *operator or producer shall issue the following reports to the owners of said interests by a sworn, detailed, itemized statement*:

> (1) Within ninety calendar days from completion of the well, an initial report which shall contain the costs of drilling, completing, and equipping the unit well.

No. 22-30379

> (2) After establishment of production from the unit well, quarterly reports which shall contain the following:
>
>> (a) The total amount of oil, gas, or other hydrocarbons produced from the lands during the previous quarter.
>>
>> (b) The price received from any purchaser of unit production.
>>
>> (c) Quarterly operating costs and expenses.
>>
>> (d) Any additional funds expended to enhance or restore the production of the unit well.
>
> . . .
>
> D. Notwithstanding any other provision of this Section to the contrary, at the time a report is due pursuant to this Section, if the share of the total costs of drilling, completing, and equipping the unit well and all other unit costs allocable to an owner of an unleased interest is less than one thousand dollars, no report shall be required. However, during January of the next calendar year, the operator or producer shall report such costs to the owner.

La. Rev. Stat. § 30:103.1 (2019) (emphasis added).

Recently, we described the interplay between these two provisions:

> Section 103.2 adds teeth to § 103.1; it disincentivizes operators' failure to comply with § 103.1's reporting requirements. Taken together, §§ 103.1 and 103.2 address an information asymmetry that arises from the forced pooling of mineral resources when there is no lease or contract between the operator and the owner of the oil and gas . . . . Thus, §§ 103.1 and 103.2 help remedy the information asymmetry by creating an enforceable mechanism for nonoperators that have unleased interests in the minerals to obtain an accounting of what the operator is doing.

*B. A. Kelly Land Co. v. Aethon Energy Operating, L.L.C.*, 25 F.4th 369, 376 (5th Cir. 2022) (citations and internal quotation marks omitted).

At bottom, the parties dispute which costs are covered by the phrase "costs of drilling operations" in § 103.2. On the one hand, BPX argues the phrase only encompasses the enumerated set of specific drilling costs. Dow retorts that "costs of the drilling operations" refers back to the expenditures referenced in section 103.1, and "operating costs and expenses" and "funds expended to enhance . . . the production of the unit well," capture post-production costs. Therefore, Dow argues, "costs of drilling operations" include post-production costs as well.

Absent binding authority from the Louisiana Supreme Court, we look to the only intermediate-court case that appears to have addressed this question: *XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, 2016-269 (La. App. 3 Cir. 9/28/16); 206 So. 3d 885. There, the Louisiana Third Circuit Court of Appeal held that the penalty for "costs of the drilling operations" includes both pre- and post-production costs. *Id.* at 890. In coming to this conclusion, the court emphasized that the two provisions should be read together to discern the intention of the legislature. *Id.* Comparing the original statute with the current version, the court determined that the legislature used the phrase "cost of the drilling operations" to refer back to the expenditures referenced in § 103.1. *Id.* As such, the term "drilling operations" connotes both drilling and operational aspects of taking and producing oil and gas from land. *Id.* "Otherwise, there would be no incentive for the operator or producer to provide the quarterly reports." *Id.*

The context surrounding the text supports this reading. The statutory scheme provides an exception to the reporting requirement if the "share of the total costs of drilling, completing, and equipping the unit well and all other unit costs allocable to an owner" is less than $1,000. *See* LA. REV.

STAT. 30:103.1(D) (2019). In which case "the operator or producer *shall report such costs* to the owner" during January of the next calendar year. *Id.* (emphasis added).

The phrase "such costs" in the clause relates to the costs addressed earlier in the section, specifically "costs of drilling, completing, and equipping the unit well and all other unit costs." *Id.* The phrase "all other" costs naturally encompasses post-production expenses as they are "other unit costs." As the district court recognized, it would be odd for the legislature to require operators to report post-production expenses when total costs are less than $1,000 and relatively negligible but not when total costs are greater.

Further, the text also requires reporting multiple categories of costs that could encompass post-production costs. Take "operating costs and expenses." *See* 30:103.1(A)(2)(c) (2019). The term "operating" is commonly defined as "of, relating to, or use for or in operations."[2] It is reasonable to think that post-production costs could be categorized as "operational costs and expenses" because they form an integral part of the overall business operations. After all, the value of minerals is contingent upon a series of actions that must be taken to render them useful, including but not limited to transportation, marketing, processing, dehydration, treatment, compression, and collection. Without these measures, minerals are often deemed worthless. *See Merritt v. Sw. Elec. Power Co.*, 499 So. 2d 210, 213–14 (La. Ct. App. 1986). Of note, this interpretation aligns perfectly with what Petrohawk, BPX's transferor, did; they classified expenses linked to marketing, taxes, gathering, and transportation as "operational expenses."

---

[2] *Operating*, MERRIAM-WEBSTER (2025), https://www.merriam-webster.com/ dictionary/operating.

Moreover, this interpretation is consistent with the purpose of the statute. It goes against the foundation of the forced-pooling framework to suggest—as BPX does—that an operator can subtract post-production expenses without any responsibility to disclose this information to lessees. As stated above, these provisions were put in place to remedy information asymmetry by creating an enforceable mechanism "for nonoperators that have unleased interests in the minerals to obtain an accounting of what the operator is doing." *B.A. Kelly Land Co.*, 25 F.4th at 376 (quotation omitted). To accept BPX's argument would mean reading an information asymmetry safe haven into a statute created to remedy information asymmetries. We decline to do so and AFFIRM the district court on this front.

## D.

Finally, we address whether § 30:103.2 is subject to a one-year or ten-year perspective period. BPX argues that the one-year delictual period applies, whereas Dow contends (and the district court concluded) that the ten-year contractual period is more appropriate.

Under Louisiana law, "[t]he correct prescriptive period to be applied in any action depends on the nature of the action; it is the duty breached that should determine whether an action is in tort or contract." *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 886 (5th Cir. 2002); *accord Trinity Universal Ins. Co. v. Horton*, 33,157, p. 2 (La. App. 2 Cir. 4/5/00); 756 So. 2d 637, 638.

"The classical distinction between contractual and delictual damages is that the former flow from an obligation contractually assumed by the obligor . . . ." *Terrebonne*, 310 F.3d at 886. Even where there is a contract between the parties, Louisiana courts will still scrutinize the claims to determine if they are contractual or delictual. *See Terrebonne*, 310 F.3d at 887 & n.45 (collecting cases); *see also Delict*, BLACK'S LAW DICTIONARY

(10th ed. 2014) ("A violation of the law; esp., a wrongful act or omission giving rise to a claim for compensation; TORT."). Ultimately, Louisiana courts treat an action as delictual unless a plaintiff alleges the violation of a specific contractual provision. *See Kroger Co. v. L.G. Barcus & Sons, Inc.*, 44,200, p. 4 (La. App. 2 Cir. 6/17/09); 13 So. 3d 1232, 1235.

The Louisiana Supreme Court has stated "that where an action arises out of 'the breach of duty as *imposed by law*, the damages arose ex delicto, and are extinguished by the prescription of *one* year.'" *DePhillips v. Hosp. Serv. Dist. No. 1*, 2019-01496, p. 7 (La. 7/9/20); 340 So. 3d 817, 822 (cleaned up) (quoting *Lagrone v. Kansas City So. Ry. Co.*, 102 So. 669, 670 (1925)). Further, the court concluded that "plaintiff cannot circumvent the one-year prescriptive period applicable to his claims where the source of the underlying duty is statutory. 'The mere fact that the circumstances arose in the context of a contractual relationship does not make the cause of action contractual.'" *Id.* at 824 (quoting *Thomas v. State Emps. Grp. Benefits Program*, 2005-0392, p. 5 (La. App. 1 Cir. 3/24/06); 934 So. 2d 753, 757).

Here, Dow does not allege that BPX violated any specific contractual provision; rather, it alleges a violation of a statutory duty. Again, "where an action arises out of 'the breach of duty as *imposed by law*, the damages arose ex delicto, and are extinguished by the prescription of *one* year.'" *DePhillips*, 340 So. 3d at 819.

Moreover, Dow's claims flow from the same general statutory duty at issue in *Self*. It is undisputed that Dow alleges a breach of the notice provision of § 103.1. The statutory scheme creates a remedy for that breach in § 103.2, so that an operator that breaches "shall forfeit his right to demand contribution from the owner or owners of the unleased oil, gas, or brine interests for the costs of the drilling operations of the well." This is not an "obligation contractually assumed by the obligor" based on a specific

No. 22-30379

contract provision. *Terrebonne*, 310 F.3d at 886. Instead, by the plain language of the Act, this is *statutorily* owed by the operator to all interest owners who call attention to the operator's failure to timely account for costs. Accordingly, we conclude that Dow's claims are subject to the one-year prescriptive period that applies to delictual claims and REVERSE the district court's denial of BPX's motion to dismiss based on the prescriptive period having elapsed.

## IV.

For the foregoing reasons, we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for further proceedings consistent with this opinion.